# AUSTIN, MICHIGAN SECRETARY OF STATE, ET AL. *v.* MICHIGAN STATE CHAMBER OF COMMERCE

No. 88–1569.   Argued October 31, 1989—Decided March 27, 1990

654

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, BLACKMUN, and STEVENS, JJ., joined. BRENNAN, J., *post*, p. 669, and STEVENS, J., *post*, p. 678, filed concurring opinions. SCALIA, J., filed a dissenting opinion, *post*, p. 679. KENNEDY, J., filed a dissenting opinion, in which O'CONNOR and SCALIA, JJ., joined, *post*, p. 695.

*Louis J. Caruso*, Solicitor General of Michigan, argued the cause for appellants. With him on the briefs were *Frank J. Kelley*, Attorney General, *pro se, Thomas L. Casey*, Assistant Solicitor General, and *Gary P. Gordon* and *Richard P. Gartner*, Assistant Attorneys General.

*Richard D. McLellan* argued the cause for appellee. With him on the brief were *Joel M. Boyden, William J. Perrone*, and *Cindy M. Wilder*.*

JUSTICE MARSHALL delivered the opinion of the Court.

In this appeal, we must determine whether § 54(1) of the Michigan Campaign Finance Act, 1976 Mich. Pub. Acts 388, violates either the First or the Fourteenth Amendment to the Constitution. Section 54(1) prohibits corporations from using corporate treasury funds for independent expenditures in support of, or in opposition to, any candidate in elections for state office. Mich. Comp. Laws § 169.254(1) (1979). Cor-

---

*Briefs of *amici curiae* urging reversal were filed for the Federal Election Commission by *Lawrence M. Noble* and *Richard B. Bader;* and for Common Cause by *Roger M. Witten, Carol F. Lee*, and *Archibald Cox.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union by *Arthur B. Spitzer, John A. Powell*, and *Joel M. Gora;* for the American Medical Association et al. by *Michael A. Nemeroff, Carter G. Phillips*, and *Mark D. Hopson;* for the Center for Public Interest Law by *Robert C. Fellmeth;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Paul D. Kamenar.*

*Thomas J. Hart* filed a brief of *amici curiae* for the National Organization for Women et al.

porations are allowed, however, to make such expenditures from segregated funds used solely for political purposes. § 169.255(1). In response to a challenge brought by the Michigan State Chamber of Commerce (Chamber), the Sixth Circuit held that § 54(1) could not be applied to the Chamber, a Michigan nonprofit corporation, without violating the First Amendment. 856 F. 2d 783 (1988). Although we agree that expressive rights are implicated in this case, we hold that application of § 54(1) to the Chamber is constitutional because the provision is narrowly tailored to serve a compelling state interest. Accordingly, we reverse the judgment of the Court of Appeals.

I

Section 54(1) of the Michigan Campaign Finance Act prohibits corporations from making contributions and independent expenditures in connection with state candidate elections.[1] The issue before us is only the constitutionality of the State's ban on independent expenditures. The Act defines "expenditure" as "a payment, donation, loan, pledge, or promise of payment of money or anything of ascertainable monetary value for goods, materials, services, or facilities in assistance of, or in opposition to, the nomination or election of a candidate." § 169.206(1). An expenditure is considered independent if it is "not made at the direction of, or under the control of, another person and if the expenditure is not a contribution to a committee." § 169.209(1); see § 169.203(4) (defining "committee" as a group that "receives contributions or makes expenditures for the purpose of influencing or attempting to influence the action of the voters for or against the nomination or election of a candidate"). The Act exempts from this general prohibition against corporate political spending any expenditure made from a segregated fund.

---

[1] Section 54(1) is modeled on a provision of the Federal Election Campaign Act of 1971, 86 Stat. 11, as amended, 2 U. S. C. §§ 431–455, that requires corporations and labor unions to use segregated funds to finance independent expenditures made in federal elections. § 441b.

§ 169.255(1). A corporation may solicit contributions to its political fund only from an enumerated list of persons associated with the corporation. See §§ 169.255(2), (3).

The Chamber, a nonprofit Michigan corporation, challenges the constitutionality of this statutory scheme. The Chamber comprises more than 8,000 members, three-quarters of whom are for-profit corporations. The Chamber's general treasury is funded through annual dues required of all members. Its purposes, as set out in the bylaws, are to promote economic conditions favorable to private enterprise; to analyze, compile, and disseminate information about laws of interest to the business community and to publicize to the government the views of the business community on such matters; to train and educate its members; to foster ethical business practices; to collect data on, and investigate matters of, social, civic, and economic importance to the State; to receive contributions and to make expenditures for political purposes and to perform any other lawful political activity; and to coordinate activities with other similar organizations.

In June 1985 Michigan scheduled a special election to fill a vacancy in the Michigan House of Representatives. Although the Chamber had established and funded a separate political fund, it sought to use its general treasury funds to place in a local newspaper an advertisement supporting a specific candidate. As the Act made such an expenditure punishable as a felony, see § 169.254(5), the Chamber brought suit in District Court for injunctive relief against enforcement of the Act, arguing that the restriction on expenditures is unconstitutional under both the First and the Fourteenth Amendments.

The District Court upheld the statute. 643 F. Supp. 397 (WD Mich. 1986). The Sixth Circuit reversed, reasoning that the expenditure restriction, as applied to the Chamber, violated the First Amendment. We noted probable jurisdiction, 490 U. S. 1045 (1989), and now reverse.

## II

To determine whether Michigan's restriction on corporate political expenditures may constitutionally be applied to the Chamber, we must ascertain whether it burdens the exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling state interest. *Buckley* v. *Valeo*, 424 U. S. 1, 44–45 (1976) *(per curiam)*. Certainly, the use of funds to support a political candidate is "speech"; independent campaign expenditures constitute "political expression 'at .the core of our electoral process and of the First Amendment freedoms.'" *Id.*, at 39 (quoting *Williams* v. *Rhodes*, 393 U. S. 23, 32 (1968)). The mere fact that the Chamber is a corporation does not remove its speech from the ambit of the First Amendment. See, *e. g.*, *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 777 (1978).

## A

This Court concluded in *FEC* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238 (1986) *(MCFL)*, that a federal statute requiring corporations to make independent political expenditures only through special segregated funds, 2 U. S. C. § 441b, burdens corporate freedom of expression. *MCFL*, 479 U. S., at 252 (plurality opinion); *id.*, at 266 (O'CONNOR, J., concurring in part and concurring in judgment). The Court reasoned that the small nonprofit corporation in that case would face certain organizational and financial hurdles in establishing and administering a segregated political fund. For example, the statute required the corporation to appoint a treasurer for its segregated fund, keep records of all contributions, file a statement of organization containing information about the fund, and update that statement periodically. *Id.*, at 253 (plurality opinion). In addition, the corporation was permitted to solicit contributions to its segregated fund only from "members," which did not include persons who merely contributed to or indicated support for the organization. *Id.*, at 254 (plurality opinion).

These hurdles "impose[d] administrative costs that many small entities [might] be unable to bear" and "create[d] a disincentive for such organizations to engage in political speech." *Ibid;* see also *id.,* at 265–266 (O'CONNOR, J.).

Despite the Chamber's success in administering its separate political fund, see, *e. g.,* Tr. 443 (Chamber expected to have over $140,000 in its segregated fund available for use in the 1986 elections), Michigan's segregated fund requirement still burdens the Chamber's exercise of expression because "the corporation is *not* free to use its general funds for campaign advocacy purposes." *MCFL, supra,* at 252 (plurality opinion). The Act imposes requirements similar to those in the federal statute involved in *MCFL:* a segregated fund must have a treasurer, § 169.221; and its administrators must keep detailed accounts of contributions, § 169.224, and file with state officials a statement of organization, *ibid.* In addition, a nonprofit corporation like the Chamber may solicit contributions to its political fund only from members, stockholders of members, officers or directors of members, and the spouses of any of these persons. § 169.255. Although these requirements do not stifle corporate speech entirely, they do burden expressive activity. See *MCFL,* 479 U. S., at 252 (plurality opinion); *id.,* at 266 (O'CONNOR, J.). Thus, they must be justified by a compelling state interest.

## B

The State contends that the unique legal and economic characteristics of corporations necessitate some regulation of their political expenditures to avoid corruption or the appearance of corruption. See *FEC v. National Conservative Political Action Committee,* 470 U. S. 480, 496–497 (1985) *(NCPAC)* ("[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances"). State law grants corporations special advantages—such as limited liability, perpetual life, and favorable

treatment of the accumulation and distribution of assets — that enhance their ability to attract capital and to deploy their resources in ways that maximize the return on their shareholders' investments. These state-created advantages not only allow corporations to play a dominant role in the Nation's economy, but also permit them to use "resources amassed in the economic marketplace" to obtain "an unfair advantage in the political marketplace." *MCFL*, 479 U. S., at 257. As the Court explained in *MCFL*, the political advantage of corporations is unfair because

> "[t]he resources in the treasury of a business corporation . . . are not an indication of popular support for the corporation's political ideas. They reflect instead the economically motivated decisions of investors and customers. The availability of these resources may make a corporation a formidable political presence, even though the power of the corporation may be no reflection of the power of its ideas." *Id.*, at 258.

We therefore have recognized that "the compelling governmental interest in preventing corruption support[s] the restriction of the influence of political war chests funneled through the corporate form." *NCPAC, supra*, at 500–501; see also *MCFL, supra*, at 257.

The Chamber argues that this concern about corporate domination of the political process is insufficient to justify a restriction on independent expenditures. Although this Court has distinguished these expenditures from direct contributions in the context of federal laws regulating individual donors, *Buckley*, 424 U. S., at 47, it has also recognized that a legislature might demonstrate a danger of real or apparent corruption posed by such expenditures when made by corporations to influence candidate elections, *Bellotti, supra*, at 788, n. 26. Regardless of whether this danger of "financial *quid pro quo*" corruption, see *NCPAC, supra*, at 497; *post*, at 702–705 (KENNEDY, J., dissenting), may be sufficient to justify a restriction on independent expenditures, Michigan's regula-

tion aims at a different type of corruption in the political arena: the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas. See *supra*, at 658–659. The Act does not attempt "to equalize the relative influence of speakers on elections," *post*, at 705 (KENNEDY, J., dissenting); see also *post*, at 684 (SCALIA, J., dissenting); rather, it ensures that expenditures reflect actual public support for the political ideas espoused by corporations. We emphasize that the mere fact that corporations may accumulate large amounts of wealth is not the justification for §54; rather, the unique state-conferred corporate structure that facilitates the amassing of large treasuries warrants the limit on independent expenditures. Corporate wealth can unfairly influence elections when it is deployed in the form of independent expenditures, just as it can when it assumes the guise of political contributions. We therefore hold that the State has articulated a sufficiently compelling rationale to support its restriction on independent expenditures by corporations.

## C

We next turn to the question whether the Act is sufficiently narrowly tailored to achieve its goal. We find that the Act is precisely targeted to eliminate the distortion caused by corporate spending while also allowing corporations to express their political views. Contrary to the dissents' critical assumptions, see *post*, at 698, 699, 706 (KENNEDY, J.); *post*, at 680, 682–683 (SCALIA, J.), the Act does not impose an *absolute* ban on all forms of corporate political spending but permits corporations to make independent political expenditures through separate segregated funds. Because persons contributing to such funds understand that their money will be used solely for political purposes, the speech generated accurately reflects contributors' support

for the corporation's political views. See *MCFL, supra,* at 258.

The Chamber argues that § 54(1) is substantially overinclusive, because it includes within its scope closely held corporations that do not possess vast reservoirs of capital. We rejected a similar argument in *FEC* v. *National Right to Work Committee,* 459 U. S. 197 (1982) *(NRWC),* in the context of federal restrictions on the persons from whom corporations could solicit contributions to their segregated funds. The Court found that the federal campaign statute, 2 U. S. C. § 441b, "reflect[ed] a legislative judgment that the special characteristics of the corporate structure require particularly careful regulation. While § 441b restricts the solicitation of corporations and labor unions without great financial resources, as well as those more fortunately situated, we accept Congress' judgment that it is the *potential* for such influence that demands regulation." 459 U. S., at 209–210 (citation omitted; emphasis added). Although some closely held corporations, just as some publicly held ones, may not have accumulated significant amounts of wealth, they receive from the State the special benefits conferred by the corporate structure and present the potential for distorting the political process. This potential for distortion justifies § 54(1)'s general applicability to all corporations. The section therefore is not substantially overbroad.

## III

The Chamber contends that even if the Campaign Finance Act is constitutional with respect to for-profit corporations, it nonetheless cannot be applied to a nonprofit ideological corporation like a chamber of commerce. In *MCFL,* we held that the nonprofit organization there had "features more akin to voluntary political associations than business firms, and therefore should not have to bear burdens on independent spending solely because of [its] incorporated status." 479 U. S., at 263. In reaching that conclusion, we enumerated

three characteristics of the corporation that were "essential" to our holding. *Ibid.* Because the Chamber does not share these crucial features, the Constitution does not require that it be exempted from the generally applicable provisions of § 54(1).

The first characteristic of Massachusetts Citizens for Life, Inc., that distinguished it from ordinary business corporations was that the organization "was formed for the express purpose of promoting political ideas, and cannot engage in business activities." *Id.*, at 264. Its articles of incorporation indicated that its purpose was "[t]o foster respect for human life and to defend the right to life of all human beings, born and unborn, through educational, political and other forms of activities," *id.*, at 241–242, and all of the organization's activities were "designed to further its agenda," *id.*, at 242. MCFL's narrow political focus thus "ensure[d] that [its] political resources reflect[ed] political support." *Id.*, at 264.

In contrast, the Chamber's bylaws set forth more varied purposes, see *supra*, at 656, several of which are not inherently political. For instance, the Chamber compiles and disseminates information relating to social, civic, and economic conditions, trains and educates its members, and promotes ethical business practices. Unlike MCFL's, the Chamber's educational activities are not expressly tied to political goals; many of its seminars, conventions, and publications are politically neutral and focus on business and economic issues. The Chamber's president and chief executive officer stated that one of the corporation's main purposes is to provide "service to [its] membership that includes everything from group insurance to educational seminars, and . . . litigation activities on behalf of the business community." Deposition of E. James Barrett, Nov. 12, 1985, p. 11. See also PR Newswire, July 21, 1989 (Chamber cosponsored the Automotive Management Briefing Seminar); PR Newswire, May 9, 1989 (Chamber cosponsored the Michigan New Product Awards

competition); PR Newswire, June 14, 1988 (Chamber sponsored seminar on product liability losses and lawsuits); PR Newswire, Feb. 4, 1988 (Chamber cosponsored outreach program to increase awareness of investment opportunities in the Caribbean Basin). The Chamber's nonpolitical activities therefore suffice to distinguish it from MCFL in the context of this characteristic.

We described the second feature of MCFL as the absence of "shareholders or other persons affiliated so as to have a claim on its assets or earnings. This ensures that persons connected with the organization will have no economic disincentive for disassociating with it if they disagree with its political activity." 479 U. S., at 264. Although the Chamber also lacks shareholders, many of its members may be similarly reluctant to withdraw as members even if they disagree with the Chamber's political expression, because they wish to benefit from the Chamber's nonpolitical programs and to establish contacts with other members of the business community. The Chamber's political agenda is sufficiently distinct from its educational and outreach programs that members who disagree with the former may continue to pay dues to participate in the latter. JUSTICE KENNEDY ignores these disincentives for withdrawing as a member of the Chamber, stating only that "[o]ne need not become a member . . . to earn a living." *Post*, at 710 (KENNEDY, J., dissenting). Certainly, members would be disinclined to terminate their involvement with the organization on the basis of less extreme disincentives than the loss of employment. Thus, we are persuaded that the Chamber's members are more similar to shareholders of a business corporation than to the members of MCFL in this respect.[2]

---

[2] A requirement that the Chamber disclose the nature and extent of its political activities, see *post*, at 707 (KENNEDY, J., dissenting), would not eliminate the possible distortion of the political process inherent in independent expenditures from general corporate funds. Given the significant incentive for members to continue their financial support for the Chamber

The final characteristic upon which we relied in *MCFL* was the organization's independence from the influence of business corporations. On this score, the Chamber differs most greatly from the Massachusetts organization. MCFL was not established by, and had a policy of not accepting contributions from, business corporations. Thus it could not "serv[e] as [a] condui[t] for the type of direct spending that creates a threat to the political marketplace." 479 U. S., at 264. In striking contrast, more than three-quarters of the Chamber's members are business corporations, whose political contributions and expenditures can constitutionally be regulated by the State. See *Buckley* v. *Valeo*, 424 U. S., at 29 (upholding restrictions on political contributions); *supra*, at 658–661 (regarding independent expenditures). As we read the Act, a corporation's payments into the Chamber's general treasury would not be considered payments to influence an election, so they would not be "contributions" or "expenditures," see §§ 169.204(1), 169.206, and would not be subject to the Act's limitations. Business corporations therefore could circumvent the Act's restriction by funneling money through the Chamber's general treasury.[3] Because the Chamber accepts money from for-profit corporations, it could, absent application of § 54(1), serve as a conduit for corporate political spending. In sum, the Chamber does not possess the fea-

---

in spite of their disagreement with its political agenda, disclosure will not ensure that the funds in the Chamber's treasury correspond to members' support for its ideas.

[3] A nonprofit corporation's segregated fund, on the other hand, apparently cannot receive contributions from corporations. See Mich. Comp. Laws § 169.255(3) (1979) (allowing contributions only from "(a) Members of the corporation who are individuals. (b) Stockholders of members of the corporation. (c) Officers or directors of members of the corporation"). In addition, a corporation's payment to a segregated fund would likely be considered a contribution or expenditure because the sole purpose of such segregated funds is to make political contributions and expenditures. § 169.255(1). The segregated fund, therefore, could not be used as a conduit for business corporations' political spending.

tures that would compel the State to exempt it from restriction on independent political expenditures.

## IV

The Chamber also attacks § 54(1) as underinclusive because it does not regulate the independent expenditures of unincorporated labor unions.[4] Whereas unincorporated unions, and indeed individuals, may be able to amass large treasuries, they do so without the significant state-conferred advantages of the corporate structure; corporations are "by far the most prominent example of entities that enjoy legal advantages enhancing their ability to accumulate wealth." *MCFL*, 479 U. S., at 258, n. 11. The desire to counterbalance those advantages unique to the corporate form is the State's compelling interest in this case; thus, excluding from the statute's coverage unincorporated entities that also have the capacity to accumulate wealth "does not undermine its justification for regulating corporations." *Ibid.*

Moreover, labor unions differ from corporations in that union members who disagree with a union's political activities need not give up full membership in the organization to avoid supporting its political activities. Although a union and an employer may require that all bargaining unit employees become union members, a union may not compel those employees to support financially "union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment." *Communications Workers* v. *Beck*, 487 U. S. 735, 745 (1988). See also *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977) (holding that compelling nonmember employees to contribute to union's political activities infringes employees' First Amendment rights). An employee who objects to a union's political activities thus can decline to contribute to those activities, while continuing to enjoy the

---

[4] The Federal Election Campaign Act restricts the independent expenditures of labor organizations as well as those of corporations. 2 U. S. C. § 441b(a).

benefits derived from the union's performance of its duties as the exclusive representative of the bargaining unit on labor-management issues. As a result, the funds available for a union's political activities more accurately reflects members' support for the organization's political views than does a corporation's general treasury. Michigan's decision to exclude unincorporated labor unions from the scope of § 54(1) is therefore justified by the crucial differences between unions and corporations.

## V

Because we hold that § 54(1) does not violate the First Amendment, we must address the Chamber's contention that the provision infringes its rights under the Fourteenth Amendment. The Chamber argues that the statute treats similarly situated entities unequally. Specifically, it contends that the State should also restrict the independent expenditures of unincorporated associations with the ability to accumulate large treasuries and of corporations engaged in the media business.

Because the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest. *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 101 (1972). We find that, even under such strict scrutiny, the statute's classifications pass muster under the Equal Protection Clause. As we explained in the context of our discussions of whether the statute was overinclusive, *supra*, at 660–661, or underinclusive, *supra*, at 665 and this page, the State's decision to regulate only corporations is precisely tailored to serve the compelling state interest of eliminating from the political process the corrosive effect of political "war chests" amassed with the aid of the legal advantages given to corporations.

Similarly, we find that the Act's exemption of media corporations from the expenditure restriction does not render the statute unconstitutional. The "media exception" ex-

cludes from the definition of "expenditure" any "expenditure by a broadcasting station, newspaper, magazine, or other periodical or publication for any news story, commentary, or editorial in support of or opposition to a candidate for elective office . . . in the regular course of publication or broadcasting," § 169.206(3)(d).[5] The Court of Appeals did not address the Chamber's equal protection argument because it found that the application of § 54(1) to the Chamber violates the First Amendment. See 856 F. 2d, at 790. The District Court, however, appeared to hold that the media exception does not implicate the Equal Protection Clause because "[a]ny corporation . . . may avail itself of the exemption" by entering the news broadcasting or publishing business. 643 F. Supp., at 405. We are persuaded, however, that a Fourteenth Amendment analysis is necessary in this case. It is true that the exemption does not refer expressly to "media corporations." Nevertheless, the exception will undoubtedly result in the imposition of fewer restrictions on the expression of corporations that are in the media business. Thus, it cannot be regarded as neutral, and the distinction must be justified by a compelling state purpose.

Although all corporations enjoy the same state-conferred benefits inherent in the corporate form, media corporations differ significantly from other corporations in that their resources are devoted to the collection of information and its dissemination to the public. We have consistently recognized the unique role that the press plays in "informing and educating the public, offering criticism, and providing a forum for discussion and debate." *Bellotti*, 435 U. S., at 781. See also *Mills* v. *Alabama*, 384 U. S. 214, 219 (1966)

---

[5] The Federal Election Campaign Act contains a similar exemption that excludes from the definition of expenditure "any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate." 2 U. S. C. § 431(9)(B)(i).

("[T]he press serves and was designed to serve as a power-ful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve"). The Act's definition of "expendi-ture," § 169.206, conceivably could be interpreted to encom-pass election-related news stories and editorials. The Act's restriction on independent expenditures therefore might dis-courage incorporated news broadcasters or publishers from serving their crucial societal role. The media exception en-sures that the Act does not hinder or prevent the institu-tional press from reporting on, and publishing editorials about, newsworthy events. Cf. H. R. Rep. No. 93–1239, p. 4 (1974) (explaining a similar federal media exception, 2 U. S. C. § 431(9)(B)(i), as "assur[ing] the unfettered right of the newspapers, TV networks, and other media to cover and comment on political campaigns"); 15 U. S. C. §§ 1801–1804 (enacting a limited exemption from the antitrust laws for newspapers in part because of the recognition of the special role of the press). A valid distinction thus exists between corporations that are part of the media industry and other corporations that are not involved in the regular business of imparting news to the public. Although the press' unique societal role may not entitle the press to greater protection under the Constitution, *Bellotti, supra*, at 782, and n. 18, it does provide a compelling reason for the State to exempt media corporations from the scope of political expenditure limitations. We therefore hold that the Act does not violate the Equal Protection Clause.

## VI

Michigan identified as a serious danger the significant pos-sibility that corporate political expenditures will undermine the integrity of the political process, and it has implemented a narrowly tailored solution to that problem. By requiring corporations to make all independent political expenditures

through a separate fund made up of money solicited expressly for political purposes, the Michigan Campaign Finance Act reduces the threat that huge corporate treasuries amassed with the aid of favorable state laws will be used to influence unfairly the outcome of elections. The Michigan Chamber of Commerce does not exhibit the characteristics identified in *MCFL* that would require the State to exempt it from a generally applicable restriction on independent corporate expenditures. We therefore reverse the decision of the Court of Appeals.

*It is so ordered.*

JUSTICE BRENNAN, concurring.

I join the Court's opinion. As one of the "Orwellian" "censor[s]" derided by the dissents, *post*, at 679 (SCALIA, J.); *post*, at 713 (KENNEDY, J.), and as the author of our recent decision in *FEC* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238 (1986) *(MCFL)*, I write separately to explain my views in this case.

The Michigan law at issue is not an across-the-board prohibition on political participation by corporations or even a complete ban on corporate political expenditures. Rather, the statute merely requires those corporations wishing to make independent expenditures in support of candidates to do so through segregated funds or political action committees (PAC's) rather than directly from their corporate treasuries.[1] As the dissents observe, this restriction still must be analyzed with great solicitude and care, because independent expenditures constitute expression "'at the core of our electoral process and of the First Amendment freedoms.'" *Buckley* v. *Valeo*, 424 U. S. 1, 39 (1976) *(per curiam)* (quot-

---

[1] In *MCFL*, 479 U. S. 238 (1986), we observed that the requirement that expenditures be made through PAC's "is of course distinguishable from the complete foreclosure of any opportunity for political speech that we invalidated in the state referendum context in *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978)." *Id.*, at 259, n. 12.

ing *Williams* v. *Rhodes*, 393 U. S. 23, 32 (1968)). I believe, however, that the dissents significantly overstate their case in several important respects and that the Court's decision today is faithful to our prior opinions in the campaign financing area, particularly *MCFL*.

In *MCFL*, we held that a provision of the Federal Election Campaign Act of 1971 (FECA), as added, 90 Stat. 490, and amended, 2 U. S. C. § 441b, similar to the Michigan law at issue here, could not be applied constitutionally to a small, antiabortion advocacy group. In evaluating the First Amendment challenge, however, we "acknowledge[d] the legitimacy of Congress' concern that organizations that amass great wealth in the economic marketplace not gain unfair advantage in the political marketplace." 479 U. S., at 263. Specifically, we noted that *"[d]irect corporate spending* on political activity raises the prospect that resources amassed in the economic marketplace may be used to provide an unfair advantage in the political marketplace," because "[t]he resources in the treasury of a business corporation . . . are not an indication of popular support for the corporation's political ideas." *Id.*, at 257–258 (emphasis added). Instead, these resources reflect "the economically motivated decisions of investors and customers." *Id.*, at 258. A stockholder might oppose the use of corporate funds drawn from the general treasury—which represents, after all, *his* money—in support of a particular political candidate. See *id.*, at 260, citing *FEC* v. *National Right to Work Committee*, 459 U. S. 197, 208 (1982), and *Pipefitters* v. *United States*, 407 U. S. 385, 414–415 (1972). The requirement that corporate independent expenditures be financed through a segregated fund or PAC expressly established to engage in campaign spending is designed to avert this danger. "The resources available to [a PAC], as opposed to the corporate treasury, in fact reflect popular support for the political positions of the committee." *MCFL*, 479 U. S., at 258. We thus adopted the "'underlying theory'" of FECA "'that substantial general purpose

treasuries should not be diverted to political purposes'" and that requiring funding by voluntary contributions guarantees that "'the money collected is that intended by those who contribute to be used for political purposes and not money diverted from another source.'" *Ibid.* (quoting 117 Cong. Rec. 43381 (1971) (statement of Rep. Hansen)).[2]

The PAC requirement may be unconstitutional as applied to some corporations because they do not present the dangers at which expenditure limitations are aimed. Indeed, we determined that Massachusetts Citizens for Life—the antiabortion advocacy organization at issue in *MCFL*—fell into this category.[3] We nevertheless predicted that the

---

[2] We cited with approval in *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978), a discussion of the constitutionality of restrictions on union contributions and independent expenditures in candidate elections:

"[T]he ban on union political contributions and expenditures is not total but applies only to general union funds. Contributions and expenditures made by a separate fund financed by voluntary contributions are specifically permitted, as are expenditures of general funds to solicit contributions to the separate fund. In order to engage in political discussion, a union need only convince its members that its views are sound enough to merit a contribution to a union political committee espousing the same political philosophy. The necessity of convincing union members of the value of such a contribution does not amount to a constitutionally invalid burden. After all, if union members are so unconvinced of the reasonableness of the union's position that they refuse to support it, the argument for prohibiting the union from spending dues money to support its political views is greatly strengthened. . . . In the case of unions, the statute strikes a legitimate and reasonable accommodation by distinguishing between the uses to which a separate, voluntary fund and the general treasury fund may be put." Comment, The Regulation of Union Political Activity: Majority and Minority Rights and Remedies, 126 U. Pa. L. Rev. 386, 409 (1977) (cited in *Bellotti, supra*, at 788, n. 26).

[3] JUSTICE KENNEDY is mistaken when he suggests that by upholding the as-applied challenge in *MCFL* and rejecting it here, we are embarking on "value-laden, content-based speech suppression that permits some nonprofit corporate groups but not others to engage in political speech." *Post*, at 695–696 (KENNEDY, J., dissenting). The mere fact that some as-applied challenges succeed while others fail does not create a system of

class of exempt organizations would be small, see 479 U. S., at 264, and we set out three features of MCFL that were "essential" to our holding that it could not be bound by the restriction on independent spending. *Id.*, at 263. First, the group "was formed for the express purpose of promoting political ideas, and [could not] engage in business activities." *Id.*, at 264. Second, it "ha[d] no shareholders or other persons affiliated so as to have a claim on its assets or earnings. This ensure[d] that persons connected with the organization [had] no economic disincentive for disassociating with it if they disagree[d] with its political activity." *Ibid.* (footnote omitted). Third, the group "was not established by a business corporation or a labor union, and it [was] its policy not to accept contributions from such entities. This prevent[ed it] from serving as [a] condui[t] for the type of direct spending that creates a threat to the political marketplace." *Ibid.*

The majority today persuasively demonstrates that the situation in this case is markedly different from that in *MCFL*. The Michigan State Chamber of Commerce (Chamber) is first and foremost a business association, not a political advocacy organization. See *ante*, at 661–665. The Michigan statute advances the interest identified in *MCFL* in two distinct ways, by preventing both the Chamber *and other business corporations* from using the funds of other persons for purposes that those persons may not support. First, the state law protects the small businessperson who does not wish his or her dues to be spent in support of political candidates, but who nevertheless wishes to maintain an association with the Chamber because of the myriad benefits it provides that are

"speech suppression." Whether an organization presents the threat at which the campaign finance laws are aimed has to do with the particular characteristics of the organization at issue and not with the content of its speech. Of course, if a correlation between the two factors could be shown to exist, a group would be free to mount a First Amendment challenge on that basis. Cf. *Buckley* v. *Valeo*, 424 U. S. 1, 97, n. 131 (1976). Neither appellee nor JUSTICE KENNEDY's dissent has provided any reason to believe that such a relationship exists here.

unrelated to its political activities. See *ante*, at 662–663. The bylaws state that the Chamber's "objectives and purposes" shall be in part "[t]o analyze, compile and disseminate information on laws and regulations of interest to the members" and "[t]o further the training and education of the membership by means of educational materials, seminars, conventions, bulletins, newsletters, reports and technical materials." App. 43a. To attract new members, Chamber advertisements promise a wide variety of services, including "regular and special publications, legislative briefings, group insurance, a business hot-line, and seminars." *Id.*, at 42a. Its advertising practices indicate that even the Chamber understands that membership is not a function of support for its political causes alone. A member faces significant disincentives to withdraw, even if he disagrees with the Chamber's expenditures in support of a particular candidate.

In addition, the Michigan law protects dissenting shareholders of business corporations that are members of the Chamber to the extent that such shareholders oppose the use of their money, paid as dues to the Chamber out of general corporate treasury funds, for political campaigns. See *MCFL, supra*, at 260–261; cf. *post*, at 686 (SCALIA, J., dissenting). The Michigan law prevents the Chamber from "serv[ing] as a conduit for corporate political spending." *Ante*, at 664. Even JUSTICE KENNEDY, by repeatedly using the qualifier "nonprofit" throughout his opinion, appears to concede that the Michigan law legitimately may be applied to for-profit business corporations, or at least that the Court's rationale might "suffice to justify restricting political speech by for-profit corporations." *Post*, at 703 (dissenting opinion). If that is so, JUSTICE KENNEDY's failure to sustain the statute as applied in this case is perplexing, because the Chamber, unlike other nonprofits such as MCFL, is clearly a conduit for corporations barred from making independent ex-

penditures directly.[4]    A corporation cannot under Michigan law make a contribution to a PAC out of its general treasury funds, see *ante*, at 664, n. 3, and we have upheld similar rules restricting the groups from whom PAC's may solicit contributions.    See *FEC* v. *National Right to Work Committee*, 459 U. S., at 207–211; *California Medical Assn.* v. *FEC*, 453 U. S. 182, 193–199 (1981) (plurality opinion).    It is common ground that a segregated fund, even if it is a "nonprofit corporation," cannot be used as a conduit for independent expenditures by business corporations; I find it unremarkable that the Chamber and other nonprofits cannot perform such a function either.

Of course, a member could resign from the Chamber and a stockholder could divest from a business corporation that used the Chamber as a conduit, but these options would impose a financial sacrifice on those objecting to political expenditures.[5]    See *MCFL*, 479 U. S., at 260.    It is therefore irrelevant that "[t]o the extent that members disagree with a nonprofit corporation's policies, they can seek change from within, withhold financial support, cease to associate with the group, or form a rival group of their own."    *Post*, at 710 (KENNEDY, J., dissenting).    Moreover, none of the alternatives proposed by JUSTICE KENNEDY would protect a captive

---

[4] According to JUSTICE KENNEDY's dissent, the majority holds that "it is now a felony in Michigan for the Sierra Club, or the American Civil Liberties Union" to make independent expenditures.    *Post*, at 698.    This characterization is inaccurate.    Not only are those groups not part of the proceeding before us, but the dissent has overlooked the central lesson of *MCFL* that the First Amendment may require exemptions, on an as-applied basis, from expenditure restrictions.    If a nonprofit corporation is formed with the express purpose of promoting political ideas, is not composed of members who face an economic incentive for disassociating with it, and does not accept contributions from business corporations or labor unions, then it would be governed by our *MCFL* holding.

[5] In addition, shareholders in a large business corporation may find it prohibitively expensive to monitor the activities of the corporation to determine whether it is making expenditures to which they object.

stockholder of a business corporation that used the Chamber as a conduit.[6]   While the State may have no constitutional *duty* to protect the objecting Chamber member and corporate shareholder in the absence of state action, cf. *Abood* v. *Detroit Board of Education*, 431 U. S. 209, 232–237 (1977), the State surely has a compelling interest in preventing a corporation it has chartered from exploiting those who do not wish to contribute to the Chamber's political message.   "A's right to receive information does not require the state to permit B to steal from C the funds that alone will enable B to make the communication."   Brudney, Business Corporations and Stockholders' Rights Under the First Amendment, 91 Yale L. J. 235, 247 (1981).   Cf. *Communications Workers* v. *Beck*, 487 U. S. 735 (1988); *Machinists* v. *Street*, 367 U. S. 740 (1961).   We have long recognized the importance of state corporate law in "protect[ing] the shareholders" of corporations chartered within the State.   *CTS Corp.* v. *Dynamics Corp. of America*, 481 U. S. 69, 91 (1987).

The Michigan law is concededly "underinclusive" insofar as it does not ban other types of political expenditures to which

---

[6]JUSTICE KENNEDY's argument is also inconsistent with his focus on nonprofit corporations.   The leading theory of nonprofit enterprises holds that the rationale for use of the nonprofit form lies chiefly in the so-called "nondistribution constraint"—*i. e.*, the fact that while ordinary business corporations have shareholders who are allowed to receive the residual earnings of the enterprise, the members of a nonprofit corporation are expressly prohibited from receiving any part of the assets or property of the corporation for themselves.   See Hansmann, Reforming Nonprofit Corporation Law, 129 U. Pa. L. Rev. 497, 502–507, 557 (1981); Hansmann, The Role of Nonprofit Enterprise, 89 Yale L. J. 835, 843–845 (1980).   The nondistribution constraint helps overcome contractual failure in situations where the activities of the corporation are difficult to monitor, by removing the "profit motive" and assuring those who contribute to, and contract with, the corporation that the nonprofit's managers will not exploit informational deficiencies to pursue their own private interests.   Hence, JUSTICE KENNEDY's proposed reliance on a nonprofit's donors to monitor and police the corporation's activities overlooks the *raison d'être* of the nonprofit form.

a dissenting Chamber member or corporate shareholder might object. See *post*, at 685–686 (SCALIA, J., dissenting). The particular provision at issue prohibits corporations from using treasury funds only for making independent expenditures in support of, or in opposition to, any candidate in state elections. See *ante*, at 655–656. A corporation remains free, for example, to use general treasury funds to support an initiative proposal in a state referendum.[7] See *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978).

I do not find this underinclusiveness fatal, for several reasons.[8] First, as the dissents recognize, discussions on candi-

---

[7] This very "underinclusiveness" belies the dissents' charge that the Michigan law is a broad restriction on corporate political expression; many avenues of communication are open to the Chamber. In addition, the segregated fund requirement in practice has not burdened significantly the Chamber's speech with respect to candidate-oriented expenditures. The Chamber established a PAC in 1977 and has drawn from that fund in every election since then. The Chamber has an eligible class of about 50,000 individuals from whom it can solicit contributions to its PAC under the Michigan statute, and it has been quite successful in doing so. During the 1983–1984 election cycle, the Chamber PAC raised over $102,000, and its projected resources for the 1986 primary and general elections amounted to more than $140,000. See App. in No. 86–1867 (CA6), pp. 164, 184. The District Court found that "the record in this case amply demonstrates that the Chamber PAC frequently makes independent expenditures to influence political elections, and those efforts have been tremendously successful in electing Chamber PAC endorsed candidates." App. to Juris. Statement 66a–67a.

[8] JUSTICE SCALIA also maintains that protection of dissenting shareholders cannot qualify as a valid state interest because shareholders purchase their stock on the understanding that the corporation will use their money for any profitmaking purpose, including support for political candidates with whom the shareholders may not agree. See *post*, at 686–687. We have already rejected this argument in the context of labor unions. See *Abood* v. *Detroit Board of Education*, 431 U. S. 209, 234–235 (1977); *Machinists* v. *Street*, 367 U. S. 740, 764 (1961). Rather than assuming that an employee accepts as "the deal," *post*, at 686, that the union will use his dues for any purpose that will advance the interests of the bargaining unit, including political contributions and expenditures, we have determined that "the authority to impose dues and fees [is] restricted at least to

date elections lie "at the heart of political debate." *Post,* at 698 (KENNEDY, J.); see also *post,* at 680, 692 (SCALIA, J.). But just as speech interests are at their zenith in this area, so too are the interests of unwilling Chamber members and corporate shareholders forced to subsidize that speech. The State's decision to focus on this especially sensitive context is a justifiable one.[9] Cf. *MCFL,* 479 U. S., at 258, n. 11. Second, in light of our decisions in *Bellotti, supra, Consolidated Edison Co. of New York* v. *Public Service Comm'n of New York,* 447 U. S. 530, 533–535 (1980), and related cases, a State cannot prohibit corporations from making many other types of political expenditures. One purpose of the underinclusiveness inquiry is to ensure that the proffered state interest actually underlies the law. See, *e. g.,*

---

the 'extent of denying the unions the right, over the employee's objection, to use his money to support political causes which he opposes,' . . . even though Congress was well aware that *unions had historically expended funds in the support of political candidates and issues*." *Ellis* v. *Railway Clerks,* 466 U. S. 435, 447 (1984) (quoting *Street, supra,* at 768) (emphasis added).

Given the extensive state regulation of corporations, shareholder expectations are always a function of *state law.* It is circular to say, as does JUSTICE SCALIA, that *if* a State did not protect shareholders, they would have no expectation of being protected, and therefore that the State has no legitimate interest in protecting them. JUSTICE SCALIA concedes, as he must, that an expenditure "not plausibly tied to [a corporation's] ability to make money for its shareholders" can be prohibited. *Post,* at 691. But States have always been permitted to define what qualifies as "plausibly tied" to the corporation's purpose of making money, *i. e.,* what qualifies as "corporate waste," see *Rogers* v. *Hill,* 289 U. S. 582, 591–592 (1933), including wasteful speech, see *Bellotti,* 435 U. S., at 795; *Cort* v. *Ash,* 422 U. S. 66, 84 (1975). I believe it entirely proper for a State to decide to promote the ability of investors to purchase stock in corporations without fear that their money will be used to support candidates with whom they do not agree.

[9] As JUSTICE STEVENS notes in his concurring opinion today, *post,* at 678–679, n., our decision in *Bellotti* expressly distinguished "state and federal laws regulating corporate participation in partisan *candidate* elections." 435 U. S., at 788, n. 26 (emphasis added).

*Florida Star* v. *B. J. F.*, 491 U. S. 524, 540 (1989); *FCC* v. *League of Women Voters of California*, 468 U. S. 364, 396 (1984). But to the extent that the Michigan statute is "underinclusive" only because it does not regulate corporate expenditures in referenda or other corporate expression (besides merely commercial speech), this reflects the requirements of our decisions rather than the lack of an important state interest on the part of Michigan in regulating expenditures in *candidate* elections. In this sense, the Michigan law is not "underinclusive" at all. Finally, the provision in Michigan corporate law authorizing shareholder actions against corporate waste might serve as a remedy for other types of political expenditures that have no legitimate connection to the corporation's business. See Mich. Comp. Laws § 600.3605 (1)(b) (1979);[10] cf. *Bellotti, supra,* at 795.

For these reasons, I concur in the Court's opinion.

JUSTICE STEVENS, concurring.

In my opinion the distinction between individual expenditures and individual contributions that the Court identified in *Buckley* v. *Valeo*, 424 U. S. 1, 45–47 (1976), should have little, if any, weight in reviewing corporate participation in candidate elections. In that context, I believe the danger of either the fact, or the appearance, of *quid pro quo* relationships provides an adequate justification for state regulation of both expenditures and contributions. Moreover, as we recognized in *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978), there is a vast difference between lobbying and debating public issues on the one hand, and political campaigns for election to public office on the other.* Accordingly, I join the Court's opinion and judgment.

---

[10] I express no definitive view of the proper interpretation of this provision of state law inasmuch as it is not part of the case before us.

* "In addition to prohibiting corporate contributions and expenditures for the purpose of influencing the vote on a ballot question submitted to the voters, § 8 also proscribes corporate contributions or expenditures 'for the purpose of aiding, promoting or preventing the nomination or election of

JUSTICE SCALIA, dissenting.

"Attention all citizens. To assure the fairness of elections by preventing disproportionate expression of the views of any single powerful group, your Government has decided that the following associations of persons shall be prohibited from speaking or writing in support of any candidate: ——." In permitting Michigan to make private corporations the first object of this Orwellian announcement, the Court today endorses the principle that too much speech is an evil that the democratic majority can proscribe. I dissent because that

any person to public office, or aiding, promoting, or antagonizing the interests of any political party.' . . . In this respect, the statute is not unlike many other state and federal laws regulating corporate participation in partisan candidate elections. Appellants do not challenge the constitutionality of laws prohibiting or limiting corporate contributions to political candidates or committees, or other means of influencing candidate elections. Cf. *Pipefitters* v. *United States*, 407 U. S. 385 (1972); *United States* v. *Automobile Workers*, 352 U. S. 567 (1957); *United States* v. *CIO*, 335 U. S. 106 (1948). About half of these laws, including the federal law, 2 U. S. C. § 441b (1976 ed.) (originally enacted as the Federal Corrupt Practices Act, 34 Stat. 864), by their terms do not apply to referendum votes. Several of the others proscribe or limit spending for 'political' purposes, which may or may not cover referenda. See *Schwartz* v. *Romnes*, 495 F. 2d 844 (CA2 1974).

"The overriding concern behind the enactment of statutes such as the Federal Corrupt Practices Act was the problem of corruption of elected representatives through the creation of political debts. See *United States* v. *Automobile Workers*, *supra*, at 570–575; *Schwartz* v. *Romnes*, *supra*, at 849–851. The importance of the governmental interest in preventing this occurrence has never been doubted. The case before us presents no comparable problem, and our consideration of a corporation's right to speak on issues of general public interest implies no comparable right in the quite different context of participation in a political campaign for election to public office. Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures by corporations to influence candidate elections. Cf. *Buckley* v. *Valeo*, [424 U. S. 1, 46 (1976)]; Comment, The Regulation of Union Political Activity: Majority and Minority Rights and Remedies, 126 U. Pa. L. Rev. 386, 408–410 (1977)." *First National Bank of Boston* v. *Bellotti*, 435 U. S., at 788, n. 26.

principle is contrary to our case law and incompatible with the absolutely central truth of the First Amendment: that government cannot be trusted to assure, through censorship, the "fairness" of political debate.

## I

## A

The Court's opinion says that political speech of corporations can be regulated because "[s]tate law grants [them] special advantages," *ante*, at 658, and because this "unique state-conferred corporate structure . . . facilitates the amassing of large treasuries," *ante*, at 660. This analysis seeks to create one good argument by combining two bad ones. Those individuals who form that type of voluntary association known as a corporation are, to be sure, given special advantages—notably, the immunization of their personal fortunes from liability for the actions of the association—that the State is under no obligation to confer. But so are other associations and private individuals given all sorts of special advantages that the State need not confer, ranging from tax breaks to contract awards to public employment to outright cash subsidies. It is rudimentary that the State cannot exact as the price of those special advantages the forfeiture of First Amendment rights. See *Pickering* v. *Board of Education of Township High School Dist. No. 205, Will County*, 391 U. S. 563 (1968); *Speiser* v. *Randall*, 357 U. S. 513 (1958). The categorical suspension of the right of any person, or of any association of persons, to speak out on political matters must be justified by a compelling state need. See *Buckley* v. *Valeo*, 424 U. S. 1, 44–45 (1976) *(per curiam)*. That is why the Court puts forward its second bad argument, the fact that corporations "amas[s] large treasuries." But that alone is also not sufficient justification for the suppression of political speech, unless one thinks it would be lawful to prohibit men and women whose net worth is above a certain figure from endorsing political candidates. Neither of these two flawed arguments is

improved by combining them and saying, as the Court in effect does, that "since the State gives special advantages to these voluntary associations, and since they thereby amass vast wealth, they may be required to abandon their right of political speech." *

The Court's extensive reliance upon the fact that the objects of this speech restriction, corporations, receive "special advantages" is in stark contrast to our opinion issued just six years ago in *FCC* v. *League of Women Voters of California*, 468 U. S. 364 (1984). In that decision, striking down a congressionally imposed ban upon editorializing by noncommercial broadcasting stations that receive federal funds, the *only* respect in which we considered the receipt of that "special advantage" relevant was in determining whether the speech limitation could be justified under Congress' spending power, as a means of assuring that the subsidy was devoted only to the purposes Congress intended, which did not include political editorializing. We held it could not be justified on that basis, since "a noncommercial educational station that receives only 1% of its overall income from [federal] grants is barred absolutely from all editorializing. . . . The station has

---

*The Court's assertion that the Michigan law "does not impose an *absolute* ban on all forms of corporate political spending," *ante*, at 660, is true only in a respect that is irrelevant for purposes of First Amendment analysis. A corporation is absolutely prohibited from spending its own funds on this form of political speech, and would be guilty of misrepresentation if it asserted that a particular candidate was supported or opposed by the corporation. This is to say that the corporation *as a corporation* is prohibited from speaking. What the Michigan law permits the corporation to do is to serve as the founder and treasurer of a different association of individuals that can endorse or oppose political candidates. The equivalent, where an individual rather than an association is concerned, would be to prohibit John D. Rockefeller from making political endorsements, but to permit him to form an association to which others (though not he himself) can contribute for the purpose of making political endorsements. Just as political speech by that association is not speech by John D. Rockefeller, so also speech by a corporate PAC that the Michigan law allows is not speech by the corporation itself.

no way of limiting the use of its federal funds to all non-editorializing activities, and, more importantly, it is barred from using even wholly private funds to finance its editorial activity." *Id.*, at 400. Of course the same is true here, even assuming that tax exemptions and other benefits accorded to incorporated associations constitute an exercise of the spending power. It is not just that portion of the corporation's assets attributable to the gratuitously conferred "special advantages" that is prohibited from being used for political endorsements, but *all* of the corporation's assets. I am at a loss to explain the vast difference between the treatment of the present case and *League of Women Voters.* Commercial corporations may not have a public *persona* as sympathetic as that of public broadcasters, but they are no less entitled to this Court's concern.

As for the second part of the Court's argumentation, the fact that corporations (or at least some of them) possess "massive wealth": Certain uses of "massive wealth" in the electoral process—whether or not the wealth is the result of "special advantages" conferred by the State—pose a substantial risk of corruption which constitutes a compelling need for the regulation of speech. Such a risk plainly exists when the wealth is given directly to the political candidate, to be used under his direction and control. We held in *Buckley* v. *Valeo, supra,* however, that independent expenditures to express the political views of individuals and associations do not raise a sufficient threat of corruption to justify prohibition. *Id.*, at 45. Neither the Court's opinion nor either of the concurrences makes any effort to distinguish that case—except, perhaps, by misdescribing the case as involving "federal laws regulating individual donors," *ante*, at 659, or as involving "individual expenditures," *ante*, at 678 (STEVENS, J., concurring). Section 608(e)(1) of the Federal Election Campaign Act of 1971, 18 U. S. C. § 608(e)(1) (1970 ed., Supp. V), which we found unconstitutional in *Buckley*, was directed, like the Michigan law before us here, to expenditures made for the purpose of advocating the election or de-

feat of a particular candidate, see 424 U. S., at 42. It limited to $1,000 (a *lesser* restriction than the absolute prohibition at issue here) such expenditures not merely by "individuals," but by "persons," specifically defined to include corporations. See *id.*, at 187 (setting forth § 591(g) of the statute). The plaintiffs in the case included corporations, see *id.*, at 8, and we specifically discussed § 608(e)(1) as a restriction addressed not just to individuals but to "individuals and groups," *id.*, at 39, 48, "persons and groups," *id.*, at 45, "persons and organizations," *ibid.*, "person[s] [and] association[s]," *id.*, at 50. In support of our determination that the restriction was "wholly at odds with the guarantees of the First Amendment" we cited *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241 (1974), which involved limitations upon a corporation. 424 U. S., at 50. Of course, *if* § 608(e)(1) had been unconstitutional only as applied to individuals and not as applied to corporations, we might nonetheless have invalidated it *in toto* for substantial overbreadth, see *Broadrick* v. *Oklahoma*, 413 U. S. 601, 611–613 (1973), but there is not a hint of that doctrine in our opinion. Our First Amendment law is much less certain than I had thought it to be if we are free to recharacterize each clear holding as a disguised "overbreadth" determination.

*Buckley* v. *Valeo* should not be overruled, because it is entirely correct. The contention that prohibiting overt advocacy for or against a political candidate satisfies a "compelling need" to avoid "corruption" is easily dismissed. As we said in *Buckley*, "[i]t would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate's campaign." 424 U. S., at 45. Independent advocacy, moreover, unlike contributions, "may well provide little assistance to the candidate's campaign and indeed may prove counterproductive," thus reducing the danger that it will be exchanged "as a *quid pro quo* for improper commit-

ments from the candidate." *Id.*, at 47. The latter point seems even more plainly true with respect to corporate advocates than it is with respect to individuals. I expect I could count on the fingers of one hand the candidates who would generally welcome, much less negotiate for, a formal endorsement by AT&T or General Motors. The advocacy of such entities that have "amassed great wealth" will be effective only to the extent that it brings to the people's attention *ideas* which—despite the invariably self-interested and probably uncongenial source—strike them as true.

The Court does not try to defend the proposition that independent advocacy poses a substantial risk of political "corruption," as English speakers understand that term. Rather, it asserts that that concept (which it defines as "'financial *quid pro quo*' corruption," *ante*, at 659) is really just a narrow subspecies of a hitherto unrecognized genus of political corruption. "Michigan's regulation," we are told, "aims at a different type of corruption in the political arena: the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporations's political ideas." *Ante*, at 659–660. Under this mode of analysis, virtually anything the Court deems politically undesirable can be turned into political corruption—by simply describing its effects as politically "corrosive," which is close enough to "corruptive" to qualify. It is sad to think that the First Amendment will ultimately be brought down not by brute force but by poetic metaphor.

The Court's opinion ultimately rests upon that proposition whose violation constitutes the "New Corruption": Expenditures must "reflect actual public support for the political ideas espoused." *Ante*, at 660. This illiberal free-speech principle of "one man, one minute" was proposed and soundly rejected in *Buckley:*

> "It is argued, however, that the ancillary governmental interest in equalizing the relative ability of indi-

viduals and groups to influence the outcome of elections serves to justify the limitation on express advocacy of the election or defeat of candidates imposed by § 608(e)(1)'s expenditure ceiling. But the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed 'to secure "the widest possible dissemination of information from diverse and antagonistic sources,"' and '"to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."'" 424 U. S., at 48–49 (citations omitted).

But it can be said that I have not accurately quoted today's decision. It does not endorse the proposition that government may ensure that expenditures "reflect actual public support for the political ideas espoused," but only the more limited proposition that government may ensure that expenditures "reflect actual public support for the political ideas espoused *by corporations.*" *Ante,* at 660 (emphasis added). The limitation is of course entirely irrational. Why is it perfectly all right if advocacy by an individual billionaire is out of proportion with "actual public support" for his positions? There is no explanation, except the effort I described at the outset of this discussion to make one valid proposition out of two invalid ones: When the vessel labeled "corruption" begins to founder under weight too great to be logically sustained, the argumentation jumps to the good ship "special privilege"; and when that in turn begins to go down, it returns to "corruption." Thus hopping back and forth between the two, the argumentation may survive but makes no headway towards port, where its conclusion waits in vain.

## B

JUSTICE BRENNAN's concurrence would have us believe that the prohibition adopted by Michigan and approved by the Court is a paternalistic measure to protect the corporate

shareholders of America. It is designed, we are told, "to avert [the] danger" that "corporate funds drawn from the general treasury—which represents, after all, [the share-holder's] money," might be used on behalf of a political can-didate he opposes. *Ante*, at 670 (BRENNAN, J., concurring). But such solicitude is a most implausible explanation for the Michigan statute, inasmuch as it permits corporations to take as many ideological and political positions as they please, so long as they are not "in assistance of, or in opposition to, the nomination or election of a candidate." Mich. Comp. Laws § 169.206(1) (1979). That is indeed the Court's sole basis for distinguishing *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978), which invalidated restriction of a corpora-tion's general political speech. The Michigan law appears to be designed, in other words, neither to protect shareholders, nor even (impermissibly) to "balance" general political de-bate, but to protect political candidates. Given the degree of political sophistication that ought to attend the exercise of our constitutional responsibilities, it is regrettable that this should come as a surprise.

But even if the object of the prohibition could plausibly be portrayed as the protection of shareholders (which the Court's opinion, at least, does not even assert), that would not suffice as a "compelling need" to support this blatant re-striction upon core political speech. A person becomes a member of that form of association known as a for-profit cor-poration in order to pursue economic objectives, *i. e.*, to make money. Some corporate charters may specify the line of commerce to which the company is limited, but even that can be amended by shareholder vote. Thus, in joining such an association, the shareholder knows that management may take any action that is ultimately in accord with what the ma-jority (or a specified supermajority) of the shareholders wishes, so long as that action is designed to make a profit. That is the deal. The corporate actions to which the share-holder exposes himself, therefore, include many things that

he may find politically or ideologically uncongenial: investment in South Africa, operation of an abortion clinic, publication of a pornographic magazine, or even publication of a newspaper that adopts absurd political views and makes catastrophic political endorsements. His only protections against such assaults upon his ideological commitments are (1) his ability to persuade a majority (or the requisite minority) of his fellow shareholders that the action should not be taken, and ultimately (2) his ability to sell his stock. (The latter course, by the way, does not ordinarily involve the severe psychic trauma or economic disaster that JUSTICE BRENNAN's opinion suggests.) It seems to me entirely fanciful, in other words, to suggest that the Michigan statute makes any significant contribution toward insulating the exclusively profit-motivated shareholder from the rude world of politics and ideology.

But even if that were not fanciful, it would be fanciful to think, as JUSTICE BRENNAN's opinion assumes, that there is any difference between for-profit and not-for-profit corporations insofar as the need for protection of the individual member's ideological psyche is concerned. Would it be any more upsetting to a shareholder of General Motors that it endorsed the election of Henry Wallace (to stay comfortably in the past) than it would be to a member of the American Civil Liberties Union that it endorsed the election of George Wallace? I should think much less so. Yet in the one case as in the other, the only protection against association-induced trauma is the will of the majority and, in the last analysis, withdrawal from membership.

C

In Part V of its opinion, the Court accurately sets forth our longstanding First Amendment law as follows:

"Because the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be nar-

rowly tailored to serve a compelling governmental inter-
est." *Ante,* at 666.

The Court finds this requirement fully met for the following
reason:

> "As we explained in the context of our discussions of
> whether the statute was overinclusive, *supra,* at 660–
> 661, or underinclusive, *supra,* at 665 and this page, the
> State's decision to regulate only corporations is precisely
> tailored to serve the compelling state interest of elimi-
> nating from the political process the corrosive effect of
> political 'war chests' amassed with the aid of the legal ad-
> vantages given to corporations." *Ibid.*

That state interest (assuming it is compelling) does indeed
explain why the State chose to silence "only corporations"
rather than wealthy individuals as well. But it does not ex-
plain (what "narrow tailoring" pertains to) why the State
chose to silence *all* corporations, rather than just those that
possess great wealth. If narrow tailoring means anything,
surely it must mean that action taken to counter the effect of
amassed "war chests" must be targeted, if possible, at
amassed "war chests." And surely such targeting is possi-
ble—either in the manner accomplished by the provision that
we invalidated in *Buckley, i. e.,* by limiting the prohibition to
independent expenditures above a certain amount, or in some
other manner, *e. g.,* by limiting the expenditures of only
those corporations with more than a certain amount of net
worth or annual profit.

No more satisfactory explanation for the obvious lack of
"narrow tailoring" is to be found in the Court's discussion of
overinclusiveness, to which the above-quoted passage refers.
That discussion asserts that we "rejected a similar argument"
in *FEC* v. *National Right to Work Comm.,* 459 U. S. 197
(1982) *(NRWC),* where we said that "'we accept Congress'
judgment'" that "'the special characteristics of the corporate
structure'" create a "'*potential* for . . . influence that de-

mands regulation.'" *Ante,* at 661, quoting 459 U. S., at 209–210 (emphasis added by the Court). Today's opinion then continues: "Although some closely held corporations, just as some publicly held ones, may not have accumulated significant amounts of wealth, they receive from the State the special benefits conferred by the corporate structure and present the potential for distorting the political process. This potential for distortion justifies § 54(1)'s general applicability to all corporations." *Ante,* at 661.

The Court thus holds, for the first time since Justice Holmes left the bench, that a direct restriction upon speech is narrowly enough tailored if it extends to speech that has the mere *potential* for producing social harm. *NRWC* (which in any event involved not a direct restriction upon corporate speech but a restriction upon corporate solicitation of funds for candidates) is no authority for that startling proposition, since it *did not purport* to be applying the First Amendment narrow-tailoring requirement. The principle the Court abandons today—that the mere potential for harm does not justify a restriction upon speech—had its origin in the "clear and present danger" test devised by Justice Holmes in 1919, see *Schenck* v. *United States,* 249 U. S. 47, 49–51, and championed by him and Justice Brandeis over the next decade in a series of famous opinions opposing the affirmance of convictions for subversive speech, see *Abrams* v. *United States,* 250 U. S. 616, 624 (1919) (Holmes, J., dissenting); *Gitlow* v. *New York,* 268 U. S. 652, 672 (1925) (Holmes, J., dissenting); *Whitney* v. *California,* 274 U. S. 357, 374 (1927) (Brandeis, J., concurring). The Court finally adopted their view in 1937, see *Herndon* v. *Lowry,* 301 U. S. 242, 258; see also *Bridges* v. *California,* 314 U. S. 252, 263 (1941); *Thornhill* v. *Alabama,* 310 U. S. 88, 105 (1940); *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 639 (1943); *Terminiello* v. *Chicago,* 337 U. S. 1, 4–5 (1949). Today's reversal of field will require adjustment of a fairly large number of significant First Amendment holdings. Presumably the State

may now convict individuals for selling books found to have a potentially harmful influence on minors, *Butler* v. *Michigan*, 352 U. S. 380 (1957), ban indecent telephone communications that have the potential for reaching minors, *Sable Communications of California* v. *FCC*, 492 U. S. 115 (1989), restrain the press from publishing information that has the potential for jeopardizing a criminal defendant's right to a fair trial, *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539 (1976), or the potential for damaging the reputation of the subject of an investigation, *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829 (1978), compel publication of the membership lists of organizations that have a potential for illegal activity, see *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 464 (1958), and compel an applicant for bar membership to reveal her political beliefs and affiliations to eliminate the potential for subversive activity, *Baird* v. *State Bar of Arizona*, 401 U. S. 1 (1971).

It is perplexing, or perhaps revealing, to compare the Court's cavalier treatment of the narrow-tailoring requirement today with its elaborate discussion of that issue six years ago in *League of Women Voters*. See 468 U. S., at 392–395, 397–398. As my earlier discussion makes clear, it would make no difference if the law *were* narrowly tailored to serve its goal, since that goal is not compelling. But the fact that, even having made that first error, the Court must make yet a second in order to reach today's judgment suggests what an impregnable fortress our First Amendment jurisprudence has been. The Court's explicit acceptance of "potential danger" as adequate to establish narrow tailoring, even more than its recognition of an insubstantial interests as "compelling," greatly weakens those defenses.

## D

Finally, a few words are in order concerning the Court's approval of the Michigan law's exception for "media corporations." This is all right, we are told, because of "the unique

role that the press plays in 'informing and educating the public, offering criticism, and providing a forum for discussion and debate.'" *Ante*, at 667 (citation omitted). But if one believes in the Court's rationale of "compelling state need" to prevent amassed corporate wealth from skewing the political debate, surely that "unique role" of the press does not give Michigan justification for *excluding* media corporations from coverage, but provides especially strong reason to *include* them. Amassed corporate wealth that regularly sits astride the ordinary channels of information is much more likely to produce the New Corruption (too much of one point of view) than amassed corporate wealth that is generally busy making money elsewhere. Such media corporations not only have vastly greater power to perpetrate the evil of overinforming, they also have vastly greater opportunity. General Motors, after all, will risk a stockholder suit if it makes a political endorsement that is not plausibly tied to its ability to make money for its shareholders. But media corporations make money *by* making political commentary, including endorsements. For them, unlike any other corporations, the whole world of politics and ideology is fair game. Yet the Court tells us that it is reasonable to *exclude* media corporations, rather than target them specially.

Members of the institutional press, despite the Court's approval of their illogical exemption from the Michigan law, will find little reason for comfort in today's decision. The theory of New Corruption it espouses is a dagger at their throats. The Court today holds merely that media corporations *may* be excluded from the Michigan law, not that they *must* be. We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers. See *Bellotti*, 435 U. S., at 782, and cases cited. Thus, the Court's holding on this point must be put in the following unencouraging form: "Although the press' unique societal role may not entitle the press to greater protection under the Constitution, *Bellotti*, *supra*, at 782, and

n. 18, it does provide a compelling reason for the State to exempt media corporations from the scope of political expenditure limitations." *Ante,* at 668. One must hope, I suppose, that Michigan will continue to provide this generous and voluntary exemption.

## II

I would not do justice to the significance of today's decision to discuss only its lapses from case precedent and logic. Infinitely more important than that is its departure from long-accepted premises of our political system regarding the benevolence that can be expected of government in managing the arena of public debate, and the danger that is to be anticipated from powerful private institutions that compete with government, and with one another, within that arena.

Perhaps the Michigan law before us here has an unqualifiedly noble objective—to "equalize" the political debate by preventing disproportionate expression of corporations' points of view. But governmental abridgment of liberty is always undertaken with the very best of announced objectives (dictators promise to bring order, not tyranny), and often with the very best of genuinely intended objectives (zealous policemen conduct unlawful searches in order to put dangerous felons behind bars). The premise of our Bill of Rights, however, is that there are some things—even some seemingly *desirable* things—that government cannot be trusted to do. The very first of these is establishing the restrictions upon speech that will assure "fair" political debate. The incumbent politician who says he welcomes full and fair debate is no more to be believed than the entrenched monopolist who says he welcomes full and fair competition. Perhaps the Michigan Legislature was genuinely trying to assure a "balanced" presentation of political views; on the other hand, perhaps it was trying to give unincorporated unions (a not insubstantial force in Michigan) political advantage over major employers. Or perhaps it was trying to assure a "balanced" presentation because it knows that with evenly bal-

anced speech incumbent officeholders generally win. The fundamental approach of the First Amendment, I had always thought, was to assume the worst, and to rule the regulation of political speech "for fairness' sake" simply out of bounds.

I doubt that those who framed and adopted the First Amendment would agree that avoiding the New Corruption, that is, calibrating political speech to the degree of public opinion that supports it, is even a *desirable* objective, much less one that is important enough to qualify as a compelling state interest. Those Founders designed, of course, a system in which popular ideas would ultimately prevail; but also, through the First Amendment, a system in which true ideas could readily become popular. For the latter purpose, the calibration that the Court today endorses is precisely backwards: To the extent a valid proposition has scant public support, it should have wider rather than narrower public circulation. I am confident, in other words, that Jefferson and Madison would not have sat at these controls; but if they did, they would have turned them in the opposite direction.

Ah, but then there is the special element of corporate wealth: What would the Founders have thought of that? They would have endorsed, I think, what Tocqueville wrote in 1835:

> "When the members of an aristocratic community adopt a new opinion or conceive a new sentiment, they give it a station, as it were, beside themselves, upon the lofty platform where they stand; and opinions or sentiments so conspicuous to the eyes of the multitude are easily introduced into the minds or hearts of all around. In democratic countries the governing power alone is naturally in a condition to act in this manner; but it is easy to see that its action is always inadequate, and often dangerous. . . . No sooner does a government attempt to go beyond its political sphere and to enter upon this new track than it exercises, even unintentionally, an insupportable tyranny . . . . Worse still will be the case if the

government really believes itself interested in preventing all circulation of ideas; it will then stand motionless and oppressed by the heaviness of voluntary torpor. Governments, therefore, should not be the only active powers; associations ought, in democratic nations, to stand in lieu of those powerful private individuals whom the equality of conditions has swept away." 2 A. de Tocqueville, Democracy in America 109 (P. Bradley ed. 1948).

While Tocqueville was discussing "circulation of ideas" in general, what he wrote is also true of candidate endorsements in particular. To eliminate voluntary associations — not only including powerful ones, but *especially* including powerful ones — from the public debate is either to augment the always dominant power of government or to impoverish the public debate. The case at hand is a good enough example. Why should the Michigan voters in the 93d House District be deprived of the information that private associations owning and operating a vast percentage of the industry of the State, and employing a large number of its citizens, believe that the election of a particular candidate is important to their prosperity? Contrary to the Court's suggestion, the same point cannot effectively be made through corporate PACs to which individuals may voluntarily contribute. It is important to the message that it represents the views of Michigan's leading corporations *as corporations*, occupying the "lofty platform" that they do within the economic life of the State — not just the views of some *other* voluntary associations to which some of the corporations' shareholders belong.

Despite all the talk about "corruption and the appearance of corruption" — evils that are not significantly implicated and that can be avoided in many other ways — it is entirely obvious that the object of the law we have approved today is not to prevent wrongdoing but to prevent speech. Since those

private associations known as corporations have so much money, they will speak so much more, and their views will be given inordinate prominence in election campaigns. This is not an argument that our democratic traditions allow—neither with respect to individuals associated in corporations nor with respect to other categories of individuals whose speech may be "unduly" extensive (because they are rich) or "unduly" persuasive (because they are movie stars) or "unduly" respected (because they are clergymen). The premise of our system is that there is no such thing as too much speech— that the people are not foolish but intelligent, and will separate the wheat from the chaff. As conceded in Lincoln's aphorism about fooling "all of the people some of the time," that premise will not invariably accord with reality; but it will assuredly do so much more frequently than the premise the Court today embraces: that a healthy democratic system can survive the legislative power to prescribe how much political speech is too much, who may speak, and who may not.

\*    \*    \*

Because today's decision is inconsistent with unrepudiated legal judgments of our Court, but even more because it is incompatible with the unrepealable political wisdom of our First Amendment, I dissent.

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR and JUSTICE SCALIA join, dissenting.

The majority opinion validates not one censorship of speech but two. One is Michigan's content-based law which decrees it a crime for a nonprofit corporate speaker to endorse or oppose candidates for Michigan public office. By permitting the statute to stand, the Court upholds a direct restriction on the independent expenditure of funds for political speech for the first time in its history.

The other censorship scheme, I most regret to say, is of our own creation. It is value-laden, content-based speech

suppression that permits some nonprofit corporate groups, but not others, to engage in political speech. After failing to disguise its animosity and distrust for the particular kind of political speech here at issue—the qualifications of a candidate to understand economic matters—the Court adopts a rule that allows Michigan to stifle the voices of some of the most respected groups in public life on subjects central to the integrity of our democratic system. Each of these schemes is repugnant to the First Amendment and contradicts its central guarantee, the freedom to speak in the electoral process. I dissent.

I

To understand the force of the Michigan statutory censorship scheme, one need not go beyond the facts of the case before us. The Michigan State Chamber of Commerce (Chamber) is a nonprofit corporation with an interest in candidates and public policy issues throughout the State of Michigan. The Chamber sought, on its own initiative and without communication with the candidate, to place a newspaper advertisement in support of one Richard Bandstra, a candidate for the House of Representatives in Michigan. (The proposed advertisement is reproduced in the Appendix to this opinion.) The advertisement discussed the local economy and unemployment and explained why the candidate supported by the Chamber would understand and improve local economic conditions. This communication is banned by the law here in question, the Michigan Campaign Finance Act (Act), 1976 Mich. Pub. Acts 388, Mich. Comp. Laws § 169.201 et seq. (1979).

The Act prohibits "a corporation," including a nonprofit corporation, from making any "expenditure" in connection with an election campaign for state office.[1] An expenditure

---

[1] Section 54 of the Act states:

"Sec. 54. (1) Except with respect to the exceptions and conditions in subsections (2) and (3) and section 55, and to loans made in the ordinary course of business, a corporation may not make a contribution or expendi-

includes any payment or other contribution in "assistance of, or in opposition to, the nomination or election of a candidate . . . ."[2] The Act by its terms forbids corporations to make "independent expenditures" undertaken without any coordination or even communication with a candidate's organization.[3] Under the Act, a corporate expenditure made for

ture or provide volunteer personal services which services are excluded from the definition of a contribution pursuant to section 4(3)(a).

. . . . .

"(4) Nothing in this section shall preclude a corporation or joint stock company from making an independent expenditure in any amount for the qualification, passage, or defeat of a ballot question. A corporation making an independent expenditure under this subsection shall be considered a ballot question committee for the purposes of this act." Mich. Comp. Laws § 169.254 (1979).

[2] Section 6 provides:

"Sec. 6. (1) 'Expenditure' means a payment, donation, loan, pledge, or promise of payment of money or anything of ascertainable monetary value for goods, materials, services, or facilities in assistance of, or in opposition to, the nomination or election of a candidate, or the qualifaction, passage, or defeat of a ballot question. . . .

"(2) Expenditure includes a contribution or a transfer of anything of ascertainable monetary value for purposes of influencing the nomination or election of any candidate or the qualification, passage, or defeat of a ballot question.

"(3) Expenditure does not include:

. . . . .

"(c) An expenditure for communication on a subject or issue if the communication does not support or oppose a ballot issue or candidate by name or clear inference or an expenditure for the establishment, administration, or solicitation of contributions to a fund or independent committee.

"(d) An expenditure by a broadcasting station, newspaper, magazine, or other periodical or publication for any news story, commentary, or editorial in support of or opposition to a candidate for elective office, or a ballot question in the regular course of publication or broadcasting." Mich. Comp. Laws § 169.206 (1979).

[3] Section 9(1) states:

"Sec. 9. (1) 'Independent expenditure' means an expenditure as defined in section 6 by a person if the expenditure is not made at the direction of, or under the control of, another person and if the expenditure is not a contribution to a committee." Mich. Comp. Laws § 169.209(1) (1979).

purposes of communicating on issues of public policy is permissible only if it does not support or oppose a candidate by name or by "inference."[4]   Violation of the Act is a felony.[5]

## A

The State has conceded that among those communications prohibited by its statute are the publication by a nonprofit corporation of its own assessment of a candidate's voting record.   With the *imprimatur* of this Court, it is now a felony in Michigan for the Sierra Club, or the American Civil Liberties Union, or the Michigan Chamber of Commerce, to advise the public how a candidate voted on issues of urgent concern to its members.   In both practice and theory, the prohibition aims at the heart of political debate.

As the majority must acknowledge, and as no party contests, the advertisement in this case is a paradigm of political speech.   *Buckley* v. *Valeo*, 424 U. S. 1, 14–15 (1976).   The Michigan statute bans it, however, along with all other communications by nonprofit corporate speakers that carry an inference of support for, or opposition to, a candidate, on the sole ground that the speaker is organized in corporate form. The Act operates to prohibit information essential to the ability of voters to evaluate candidates.   In my view, this speech cannot be restricted.

Far more than the interest of the Chamber is at stake. We confront here society's interest in free and informed discussion on political issues, a discourse vital to the capacity for self-government.   "In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who

---

[4] See n. 2, *supra.*

[5] Section 54(5) states:

"(5) A person who knowingly violates this section is guilty of a felony and shall be punished by a fine of not more than $5,000.00 or imprisoned for not more than 3 years, or both, and if the person is other than an individual, the person shall be fined not more than $10,000.00."   Mich. Comp. Laws § 169.254(5) (1979).

may address a public issue." *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 784–785 (1978). There is little doubt that by silencing advocacy groups that operate in the corporate form and forbidding them to speak on electoral politics, Michigan's law suffers from both of these constitutional defects.

First, the Act prohibits corporations from speaking on a particular subject, the subject of candidate elections. It is a basic precept that the State may not confine speech to certain subjects. Content-based restrictions are the essence of censorial power. *Ibid.* (invalidating statute that allowed corporations to speak on referenda issues that materially affected their business, but not on other subjects). See also *Consolidated Edison Co. of New York* v. *Public Service Comm'n of New York*, 447 U. S. 530, 537 (1980) ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic").

Second, the Act discriminates on the basis of the speaker's identity. Under the Michigan law, any person or group other than a corporation may engage in political debate over candidate elections; but corporations, even nonprofit corporations that have unique views of vital importance to the electorate, must remain mute. Our precedents condemn this censorship. See *Bellotti, supra,* at 784–786; *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92 (1972) (invalidating state statute that prohibited picketing near certain buildings but allowed certain labor picketers); *Carey* v. *Brown*, 447 U. S. 455 (1980).

The protection afforded core political speech is not diminished because the speaker is a nonprofit corporation. Even in the case of a for-profit corporation, we have upheld the right to speak on ballot issues. The *Bellotti* Court stated:

> "If the speakers here were not corporations, no one would suggest that the State could silence their proposed speech. It is the type of speech indispensable to deci-

sionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual. The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." 435 U. S., at 777 (footnotes omitted).

By using distinctions based upon both the speech and the speaker, the Act engages in the rawest form of censorship: the State censors what a particular segment of the political community might say with regard to candidates who stand for election. The Court's holding cannot be reconciled with the principle that "'legislative restrictions on advocacy of the election or defeat of political candidates are wholly at odds with the guarantees of the First Amendment.'" *Meyer* v. *Grant*, 486 U. S. 414, 428 (1988), quoting *Buckley* v. *Valeo*, *supra*, at 50.

## B

The second censorship scheme validated by today's holding is the one imposed by the Court. In *FEC* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238 (1986) *(MCFL)*, a First Amendment right to use corporate treasury funds was recognized for the nonprofit corporation then before us. Those who thought that the First Amendment exists to protect all points of view in candidate elections will be disillusioned by the Court's opinion today; for that protection is given only to a preferred class of nonprofit corporate speakers: small, single issue nonprofit corporations that pass the Court's own vague test for determining who are the favored participants in the electoral process. There can be no doubt that if a State were to enact a statute empowering an administrative board to determine which corporations could place candidate advertisements in newspapers and which could not, with authority to enforce the guidelines the Court adopts today to distinguish between the Massachusetts Citizens for Life and the Michigan Chamber of Commerce, the statute would be

held unconstitutional. The First Amendment does not permit courts to exercise speech suppression authority denied to legislatures.

The Court draws support for its discrimination among nonprofit corporate speakers from portions of our opinion in *MCFL, supra*. It must be acknowledged that certain language in *MCFL*, in particular the discussion which pointed to the express purpose of the organization to promote political ideas, *id.* at 263–265, lends support to the majority's test. That language, however, contravenes fundamental principles of neutrality for all political speech. It should not stand in the way of giving full force to the essential and vital holding of *MCFL*, which is that a nonprofit corporation engaged in political discussion of candidates and elections has the full protection of the First Amendment.

## II

The Act does not meet our standards for laws that burden fundamental rights. The State cannot demonstrate that a compelling interest supports its speech restriction, nor can it show that its law is narrowly tailored to the purported statutory end. See *Bellotti, supra*, at 786, 793–795. Restrictions on independent expenditures are unconstitutional if they fail to meet both of these standards. *Buckley* v. *Valeo*, 424 U. S. 1 (1976); *First National Bank of Boston* v. *Bellotti, supra; FEC* v. *National Conservative Political Action Committee*, 470 U. S. 480 (1985) *(NCPAC); MCFL, supra*. The majority opinion cannot establish either of these predicate conditions for the speech restriction imposed by the State.[6]

---

[6] As the primary objective of the statute is itself prohibited by the First Amendment, there is no need to explain that the statute is invalid also because it is vague and imprecise. It should be noted, however, that the criminal prohibition of speech which by "inference" can be taken to support a candidate, see Mich. Comp. Laws § 169.206(3)(c) (1979), must in itself chill speech on public issues, which the Court has already found protected in *Bellotti*.

A

Our cases acknowledge the danger that corruption poses for the electoral process, but draw a line in permissible regulation between payments to candidates ("contributions") and payments or expenditures to express one's own views ("independent expenditures"). Today's decision abandons this distinction and threatens once-protected political speech. The Michigan statute prohibits independent expenditures by a nonprofit corporate speaker to express its own views about candidate qualifications. Independent expenditures are entitled to greater protection than campaign contributions. *MCFL, supra,* at 259–260. See also *Buckley,* 424 U. S., at 20–21. "[E]xpenditure ceilings impose significantly more severe restrictions on protected freedoms of political expression and association than do . . . limitations on financial contributions." *Id.,* at 23. Candidate campaign contributions are subject to greater regulation because of the enhanced risk of corruption from the possibility that a large contribution would be given to secure political favors; independent expenditures pose no such risk:

> "Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Id.,* at 47.

Appellants' reliance on cases involving contributions, such as *FEC* v. *National Right to Work Committee,* 459 U. S. 197 (1982), is misplaced.

The proper analysis must follow our cases on independent expenditures. We have established that limitations on inde-

pendent political expenditures are subject to exacting First Amendment scrutiny. In *Buckley*, we invalidated a federal limitation on independent expenditures because they had no tendency to corrupt. By like analysis, we invalidated a ban on independent corporate expenditures for referenda issues, *First National Bank of Boston* v. *Bellotti, supra,* and a federal limitation which prohibited political committees from spending more than $1,000 in support of any candidate who had accepted public funding, *NCPAC*, 470 U. S., at 491. In *NCPAC*, we found that the mere hypothetical possibility that candidates may take notice of and reward political action committee (PAC) expenditures by giving official favors was insufficient to demonstrate that the threat of corruption justified the spending regulation. *Id.*, at 497.

The majority almost admits that, in the case of independent expenditures, the danger of a political *quid pro quo* is insufficient to justify a restriction of this kind. Since the specter of corruption, which had been "the only legitimate and compelling government interes[t] thus far identified for restricting campaign finances," *NCPAC, supra,* at 496–497, is missing in this case, the majority invents a new interest: combating the "corrosive and distorting effects of immense aggregations of wealth," *ante,* at 660, accumulated in corporate form without shareholder or public support. The majority styles this novel interest as simply a different kind of corruption, but has no support for its assertion. While it is questionable whether such imprecision would suffice to justify restricting political speech by for-profit corporations, it is certain that it does not apply to nonprofit entities.

The evil of political corruption has been defined in more precise terms. We have said: "Corruption is a subversion of the political process" whereby "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain . . . ." *NCPAC, supra,* at 497. In contrast, the interest touted by the majority is the impermis-

sible one of altering political debate by muting the impact of certain speakers.

The regulatory mechanism adopted by the Michigan statute is aimed at reducing the quantity of political speech, a rationale endorsed by today's majority. The First Amendment rests on quite the opposite theory. As we have already said in the context of political expenditures:

> "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley*, 424 U. S., at 19 (footnote omitted); see also *id.*, at 39.

In *Buckley* and *Bellotti*, acting on these precepts, we rejected the argument that the expenditure of money to increase the quantity of political speech somehow fosters corruption. The key to the majority's reasoning appears to be that because some corporate speakers are well supported and can buy press space or broadcast time to express their ideas, government may ban all corporate speech to ensure that it will not dominate political debate. The argument is flawed in at least two respects. First, the statute is overinclusive because it covers all groups which use the corporate form, including all nonprofit corporations. Second, it assumes that the government has a legitimate interest in equalizing the relative influence of speakers.

With regard to nonprofit corporations in particular, there is no reason to assume that the corporate form has an intrinsic flaw that makes it corrupt, or that all corporations possess great wealth, or that all corporations can buy more media coverage for their views than can individuals or other groups. There is no reason to conclude that independent speech by

a corporation is any more likely to dominate the political arena than speech by the wealthy individual, protected in *Buckley* v. *Valeo, supra,* or by the well-funded PAC, protected in *NCPAC, supra* (protecting speech rights of PAC's against expenditure limitations). In *NCPAC,* we discredited the argument that because PAC's spend larger amounts than individuals, the potential for corruption is greater. *Id.,* at 497–498. We distinguished between the campaign contribution at issue in *FEC* v. *National Right to Work Committee, supra,* and independent expenditures, by noting that while "the compelling governmental interest in preventing corruption supported the restriction of the influence of political war chests funneled through the corporate form" with regard to candidate campaign contributions, a similar finding could not be supported for independent expenditures. *NCPAC, supra,* at 500–501.

In addition, the notion that the government has a legitimate interest in restricting the quantity of speech to equalize the relative influence of speakers on elections is antithetical to the First Amendment:

> "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed 'to secure "the widest possible dissemination of information from diverse and antagonistic sources,"' . . . . The First Amendment's protection against governmental abridgment of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion." *Buckley, supra,* at 48–49 (citations omitted).

That those who can afford to publicize their views may succeed in the political arena as a result does not detract from the fact that they are exercising a First Amendment right. *Meyer* v. *Grant,* 486 U. S., at 426, n. 7 (upholding First Amendment right to use paid petition circulators). As we

stated in *Bellotti,* paid advocacy "may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it." 435 U. S., at 790. The suggestion that the government has an interest in shaping the political debate by insulating the electorate from too much exposure to certain views is incompatible with the First Amendment. "[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments." *Id.,* at 791; see also *Meyer, supra,* at 426, n. 7; *Brown* v. *Hartlage,* 456 U. S. 45, 60 (1982).

An argument similar to that made by the majority was rejected in *Bellotti.* There, we rejected the assumption that "corporations are wealthy and powerful and their views may drown out other points of view" or "exert an undue influence" on the electorate in the absence of a showing that the relative voice of corporations was significant. 435 U. S., at 789. And even were we to assume that some record support for this assertion would make a constitutional difference, it has not been established here. The majority provides only conjecture. All censorship is suspect; but censorship based on vague surmise is not permissible in any case.

The Act, as the State itself says, prevents a nonprofit corporate speaker from using its own funds to inform the voting public that a particular candidate has a good or bad voting record on issues of interest to the association's adherents. Though our era may not be alone in deploring the lack of mechanisms for holding candidates accountable for the votes they cast, that lack of accountability is one of the major concerns of our time. The speech suppressed in this case was directed to political qualifications. The fact that it was spoken by the Michigan Chamber of Commerce, and not a man or woman standing on a soapbox, detracts not a scintilla from its validity, its persuasiveness, or its contribution to the political dialogue.

The Court purports to distinguish *MCFL* on the ground that the nonprofit corporation permitted to speak in that case received no funds from profit-making corporations. It is undisputed that the Michigan Chamber of Commerce is itself a nonprofit corporation. The crucial difference, it is said, is that the Chamber receives corporate contributions. But this distinction rests on the fallacy that the source of the speaker's funds is somehow relevant to the speaker's right of expression or society's interest in hearing what the speaker has to say. There is no reason that the free speech rights of an individual or of an association of individuals should turn on the circumstance that funds used to engage in the speech come from a corporation. Many persons can trace their funds to corporations, if not in the form of donations, then in the form of dividends, interest, or salary. That does not provide a basis to deprive such individuals or associations of their First Amendment freedoms. The more narrow alternative of recordkeeping and funding disclosure is available. See *MCFL*, 479 U. S., at 262. A wooden rule prohibiting independent expenditures by nonprofit corporations that receive funds from business corporations invites discriminatory distinctions. The principled approach is to acknowledge that where political speech is concerned, freedom to speak extends to all nonprofit corporations, not the special favorites of a majority of this Court.

## B

The majority concludes that the Michigan Act is narrowly tailored. First, it seeks support in the availability of PAC's as an alternative to direct speech. Second, the majority advances the rationale that the restriction protects shareholders from the use of corporate funds to support speech with which they may not agree. Third, it asserts that independent expenditures funded by corporate wealth pose inherent dangers. None of these justifications can suffice to save the Act.

That the censorship applies to the nonprofit corporate speaker itself and not to a PAC that it has organized, far from being a saving feature of the regulation, further condemns it. The argument that the availability of a PAC as an alternative means, see Mich. Comp. Laws § 169.255 (1979), can save a restriction on independent corporate expenditures was rejected by the Court in *MCFL*, 479 U. S., at 253–255; *id.*, at 266 (O'CONNOR, J., concurring), as a costly and burdensome disincentive to speech. The record in this case tended to show that between 25 and 50 percent of a PAC's funds are required to establish and administer the PAC. See App. 103a, 108a. While the corporation can direct the PAC to make expenditures on behalf of candidates, the PAC can be funded only by contributions from shareholders, directors, officers, and managerial employees, and cannot receive corporate treasury funds. Mich. Comp. Laws § 169.255(3) (1979). That the avenue left open is more burdensome than the one foreclosed is "sufficient to characterize [a statute] as an infringement on First Amendment activities." 479 U. S., at 255. *Consolidated Edison Co.*, 447 U. S., at 541, n. 10; see also *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 757, n. 15 (1976). As the Court reaffirmed just two Terms ago, "[t]he First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer* v. *Grant*, 486 U. S., at 424.

The secondhand endorsement structure required by the Michigan state law debases the value of the voice of nonprofit corporate speakers. The public is not interested in what a PAC says; it does care what the group itself says, so that the group itself can be given credit or blame for the candidates it has endorsed or opposed. PAC's suffer from a poor public image. See App. 92a, 104a, 108a. An advertisement for which a nonprofit group takes direct responsibility, in all likelihood, will have more credibility and generate less distrust than one funded by a PAC. PAC's are interim, ad hoc orga-

nizations with little continuity or responsibility. The respected organizations affected by this case have a continuity, a stability, and an influence that makes it critical for their members and the public at large to evaluate their official policies to determine whether the organizations have earned credibility over a period of time. If a particular organization supports a candidate who injures its cause or offends its ideals, the organization itself, not some intermediary committee, ought to take the blame. It is a sad irony that the group before us wishes to assume that responsibility but the action of the State, endorsed by this Court, does not allow it to do so.

The diffusion of the corporate message produced by the PAC requirement also ensures a lack of fit between the statute's ends and its means. If the concern is that nonprofit corporate speech distorts the political process, it would seem that injecting the confusion of a PAC as an intermediary, albeit one controlled and directed by the corporation, further diffuses responsibility. Even if there were any possibility of corruption by allowing the Michigan Chamber of Commerce to finance the proposed advertisement supporting a candidate, it makes no sense to argue that such a possibility would be eliminated by requiring the disclaimer at the bottom to read "Paid for by the Michigan Chamber of Commerce PAC" rather than "Paid for by the Michigan Chamber of Commerce."

The majority relies on the state interest in protecting members from the use of nonprofit corporate funds to support candidates whom they may oppose. We should reject this interest as insufficient to save the Act here, just as we rejected the argument in *Bellotti*, 435 U. S., at 792–793. See also *Consolidated Edison Co., supra,* at 543.

The Court takes refuge in the argument that some members or contributors to nonprofit corporations may find their own views distorted by the organization, and cites our holding in *Abood* v. *Detroit Board of Education*, 431 U. S. 209 (1977). *Abood* does not apply here, as the disincentives to dissociate are not comparable. *Bellotti, supra,* at 794, n. 34 (noting "crucial distinction" between union members and

shareholders). One need not become a member of the Michigan Chamber of Commerce or the Sierra Club in order to earn a living. To the extent that members disagree with a nonprofit corporation's policies, they can seek change from within, withhold financial support, cease to associate with the group, or form a rival group of their own. Allowing government to use the excuse of protecting shareholder rights to stifle the speech of private, voluntary organizations undermines the First Amendment.

To create second-class speakers that can be stifled on the subject of candidate qualifications is to silence some of the most significant participants in the American public dialogue, as evidenced by the *amici* briefs filed on behalf of the Chamber of Commerce by the American Civil Liberties Union, the Center for Public Interest Law, the American Medical Association, the National Association of Realtors, the American Insurance Association, the National Organization for Women, Greenpeace Action, the National Abortion Rights Action League, the National Right to Work Committee, the Planned Parenthood Federation of America, the Fund for the Feminist Majority, the Washington Legal Foundation, and the Allied Educational Foundation. I reject any argument based on the idea that these groups and their views are not of importance and value to the self-fulfillment and self-expression of their members, and to the rich public dialogue that must be the mark of any free society. To suggest otherwise is contrary to the American political experience and our own judicial knowledge.

It is a distinctive part of the American character for individuals to join associations to enrich the public dialogue. See, *e. g.*, R. Horn, Groups and the Constitution 13–18 (1956). The theme of group identity is part of the history of American democracy. See, *e. g.*, The Federalist No. 10 (J. Madison). As Toqueville observed:

> "Americans of all ages, all conditions, and all dispositions constantly form associations. They have not only com-

mercial and manufacturing companies, in which all take part, but associations of a thousand other kinds, religious, moral, serious, futile, general or restricted, enormous or diminutive. . . . If it is proposed to inculcate some truth or to foster some feeling by the encouragement of a great example, they form a society. Wherever at the head of some new undertaking you see the government in France, or a man of rank in England, in the United States you will be sure to find an association." 2 A. de Toqueville, Democracy in America 106 (P. Bradley ed. 1948).

Finally, the majority's conclusion that the statute is not overinclusive because independent expenditures by nonprofit corporations may be assumed to have a pernicious, distorting effect on political processes does not withstand the rigorous scrutiny applicable to bans on speech. See *NCPAC*, 470 U. S., at 501. It even contradicts *MCFL*, where we said: "[A]ssociations do not suddenly present the specter of corruption merely by assuming the corporate form." 479 U. S., at 263. The Court reasons that the Chamber of Commerce benefits from a "unique state-conferred corporate structure that facilitates the amassing of large treasuries." *Ante*, at 660. This proposition is not self-evident and has little or no relation to the suppression of ideas. The reality, of course, is that some groups and organizations, particularly those with many members, may find that the nonprofit corporate form is the only feasible way of organizing so that they can transmit important views to the public as a whole. Because the unincorporated association structure carries with it a high risk of personal liability for members and operates in an uncertain legal climate, groups often prefer to organize in nonprofit corporate form. The corporate form provides clear rights and responsibilities and limits the liability of members. E. Hadden & B. French, Nonprofit Organizations 12 (1987); H. Oleck, Nonprofit Corporations, Organizations and Associations 30–31 (4th ed. 1982); M. Lane, Legal

Handbook for Nonprofit Organizations 4, 22–26, 43, 59–61, 124 (1980). For these reasons, in recent years the number of important unincorporated associations has dwindled while the number of incorporated associations has proliferated. Oleck, *supra*, at 31. By deciding to operate as a nonprofit corporation rather than an unincorporated association, a group does not forfeit its First Amendment protection to participate in political discourse.

## III

An independent ground for invalidating this statute is the blanket exemption for media corporations. It is beyond peradventure that the media could not be prohibited from speaking about candidate qualifications. The First Amendment would not tolerate a law prohibiting a newspaper or television network from spending on political comment because it operates through a corporation. See *Mills* v. *Alabama*, 384 U. S. 214, 218–220 (1966). As JUSTICE BRENNAN, supported by a majority of the Court in *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749 (1985), stated: "[T]he rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities." *Id.*, at 784 (dissenting opinion, joined by MARSHALL, BLACKMUN, and STEVENS, JJ.); *id.*, at 773 (WHITE, J., concurring in judgment) ("[T]he First Amendment gives no more protection to the press . . . than it does to others exercising their freedom of speech"). The argument relied on by the majority, that media corporations are in the business of communicating and other corporations are not, is unsatisfying. All corporations communicate with the public to some degree, whether it is their business or not; and communication is of particular importance for nonprofit corporations.

The web of corporate ownership that links media and nonmedia corporations is difficult to untangle for the purpose

of any meaningful distinction. Newspapers, television networks, and other media may be owned by parent corporations with multiple business interests. Nothing in the statutory scheme prohibits a business corporate parent from directing its newspaper to support or oppose a particular candidate. The Act not only permits that discretion or control, but makes it a crime for a public-interest nonprofit corporation to bring to light such activity if to do so infers candidate support or opposition. I can find no permissible basis under the First Amendment for the States to make this unsupported distinction among corporate speakers.

### IV

The Court's hostility to the corporate form used by the speaker in this case and its assertion that corporate wealth is the evil to be regulated is far too imprecise to justify the most severe restriction on political speech ever sanctioned by this Court. In any event, this distinction is irrelevant to a nonprofit corporation. "Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation." *MCFL*, 479 U. S., at 265. The wholesale ban on corporate political speech enacted by the Michigan Legislature is "too blunt an instrument for such a delicate task." *Ibid.*

By constructing a rationale for the jurisprudence of this Court that prevents distinguished organizations in public affairs from announcing that a candidate is qualified or not qualified for public office, the Court imposes its own model of speech, one far removed from economic and political reality. It is an unhappy paradox that this Court, which has the role of protecting speech and of barring censorship from all aspects of political life, now becomes itself the censor. In the course of doing so, the Court reveals a lack of concern for speech rights that have the full protection of the First Amendment. I would affirm the judgment.

# Michigan Needs Richard Bandstra To Help Us Be Job Competitive Again

The Michigan State Chamber of Commerce, an organization of over 8,000 member companies, associations and local chambers of commerce, is committed to making Michigan more competitive for business investment and job creation. With that goal in mind, we'd like to share some facts with the electors in the 93rd House District before they vote in tomorrow's special election.

To be job competitive, Michigan needs to have fair regulatory policies on business regarding such important issues as workers' compensation and we need to encourage greater efficiency in state government by lowering the state personal income tax.

Currently, workers' compensation costs are 20% higher in Michigan than those in neighboring states Why? Our eligibility standards are not the same as most other states. Too many people are allowed to qualify for too long a period of a time.

Many Grand Rapids businesses are competing with firms in other states having lower regulatory costs. Unless checked, this disadvantage may continue to cost Michigan jobs . . . jobs that are lost when businesses leave Michigan, expand out of state, or when out-state companies seeking to expand don't locate here in Michigan.

To ensure that Michigan is job competitive, we need legislators at the State Capitol who will show courage and stand up to special interests that advocate greater regulation and taxes.

The Michigan State Chamber of Commerce believes Richard Bandstra has the background and training to do the best job in Lansing for the people of the 93rd House District. We believe he will work to reduce workers' compensation costs and for an early rollback of the personal income tax rate.

The State Chamber is committed to job development in Michigan. We believe Richard Bandstra shares that commitment.

## On Monday June 10th, Elect Richard Bandstra State Representative 93rd House District Special Election

MICHIGAN STATE CHAMBER OF COMMERCE

Not authorized by the Candidate Committee of Richard Bandstra

Paid for by the Michigan Chamber of Commerce ● Suite 400, 200 N Washington Square ● Lansing, Michigan 48933