Kennedy v. Gardner, et al.          CV-98-608-M   12/23/99  P
                UNITED STATES DISTRICT COURT

                  DISTRICT OF NEW HAMPSHIRE


Richard E. Kennedy;
Eric Carlson; and
Lander Associates, Inc.,
     Plaintiffs

     v.                                      Civil No. 98-608-M

William M. Gardner, New Hampshire
Secretary of State; Philip T, McLaughlin,
New Hampshire Attorney General; and
Governor Jeanne Shaheen,
     Defendants


                         O R D E R


     Plaintiffs, Richard Kennedy and two potential contributors

to his political campaign, filed this action pursuant to 42

U.S.C. § 1983, seeking declaratory and injunctive relief.  They

claim that two separate campaign financing restrictions imposed

by New Hampshire Revised Statutes Annotated ("RSA") 664:4 violate

the First Amendment and are, therefore, unconstitutional.  By

prior order, the court granted in part and denied in part

plaintiffs' motion for summary judgment, concluding:


     The ban on all corporate political contributions
     imposed by RSA 664:4 I is overly restrictive and
     unconstitutionally infringes plaintiffs' First
     Amendment rights.  The "cap gap" created by RSA 664:4

V, however, does not unconstitutionally burden
plaintiffs' political speech and, therefore, survives
their constitutional challenge.

Kennedy v. Gardner, No. 98-608-M (D.N.H. September 30, 1999).


Defendants, the Governor, Attorney General, and Secretary of
State of New Hampshire, now move to amend the judgment –
essentially seeking reconsideration of that portion of the
court's order declaring RSA 664:4,I unconstitutional as an overly
broad abridgment of rights guaranteed by the First Amendment to
the United States Constitution.  Plaintiffs object.


The grounds upon which reconsideration is sought are
somewhat unclear.  Defendants merely restate their earlier
position and, without much elaboration, declare that Supreme
Court precedent dictates a result contrary to that reached by the
court in its order of September 30.  Nevertheless, they seem to
agree that a state's absolute across-the-board ban on corporate
political contributions cannot withstand constitutional scrutiny.
And, although they do not directly concede the point, defendants
surely must recognize that the plain text of RSA 664:4,I

2

accomplishes just that – a complete ban on any corporate political contributions, under threat of criminal prosecution.

To avoid the inevitable conclusion of unconstitutionality, then, defendants strive to limit the statute's literal reach by inferring limitations not apparent in its facially unambiguous text. That is, they argue that notwithstanding its plain language, the statute should be held constitutional because defendants discern within its text an implicit intention by the legislature to permit corporations to make at least some contributions for the purpose of promoting the success or defeat of a candidate or political party in a state election.

If the court would only read (no doubt meaning "write") the additional terms suggested by defendants into the statute, then, say defendants, it necessarily follows that RSA 664:4,I, is just like both Michigan's campaign finance statute (held constitutional in Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990)), and the Federal Election Campaign Act of 1971, as amended ("FECA"). So, defendants reiterate, if New

3

Hampshire's statute is properly construed, by inferring discrete limiting provisions, it easily passes constitutional muster.

Defendants' suggestion might represent a workable and effective fix of the statute's inherent deficiencies if this court were free to legislate for New Hampshire, but it is not. That part of New Hampshire's campaign finance law at issue in this case, as drafted by the legislature, is nothing like either the Michigan statute or the federal statute, and it simply cannot survive constitutional scrutiny given its plain language and the Supreme Court's reasonably clear explanation of the extent to which the First Amendment protects corporate political speech.

## Discussion

I.  Preliminary Matters.

   A.  Types and Sources of Political Contributions.

   Generally, corporate political contributions come from two different sources.  One is the corporation's operating or treasury accounts.  Money in that type of account is derived from corporate business activities, such as the sale of goods and services or the sale of corporate stock.  It is generally

4

accepted that a corporation's ability to amass such funds reflects its business acumen, but not popular support (or even the support of its shareholders) for its political views. See, e.g., Federal Election Commission v. Mass. Citizens For Life, Inc., 479 U.S. 238, 258 (1986) ("The resources in the treasury of a business corporation, however, are not an indication of popular support for the corporation's political ideas. They reflect instead the economically motivated decisions of investors and customers. The availability of these resources may make a corporation a formidable political presence, even though the power of the corporation may be no reflection of the power of its ideas.").

The other potential source of corporate political contributions is a "segregated account." Typically, segregated accounts are funded by contributions solicited from corporate officers, directors, employees, and shareholders. These accounts also represent corporate money, but money that does reflect some degree of popular support for the corporation's political goals and ideas.

> Because persons contributing to such funds understand that their money will be used solely for political purposes, the speech generated accurately reflects contributors' support for the corporation's political views.

Austin v. Michigan Chamber of Commerce, 494 U.S. at 660-61.

A corporate political contribution qualifies as "political speech," protected by the First Amendment. See, e.g., Austin, 494 U.S. at 657 ("Certainly, the use of funds to support a political candidate is 'speech'; . . . The mere fact that the [plaintiff] is a corporation does not remove its speech from the ambit of the First Amendment.") (citing First National Bank of Boston v. Bellotti, 435 U.S. 765, 777 (1978)). Nevertheless, the distinction between contributions from "treasury funds" and those from "segregated accounts" is both meaningful and constitutionally significant. The Supreme Court has generally recognized that states have a compelling interest in prohibiting corporate political contributions from treasury funds. To date, however, the Court has not recognized any state interest sufficient to justify an absolute ban on either corporate contributions or independent expenditures made from segregated funds. See generally, Austin, supra.

6

B.    "Contributions" and "Independent Expenditures."

For purposes of this case, there are two distinct means by which corporations might seek to exercise their First Amendment rights in the political arena.  First, they might make a "contribution" directly to a candidate for public office.  RSA 664 defines a contribution to include any payment, gift, forbearance, or loan to a candidate or political committee made for the purpose of influencing the nomination or election of a candidate.  RSA 664:2,VIII.  Thus, "contributions" include anything of value given directly to a candidate or political committee.

Alternatively, corporations (like other citizens) might make an independent expenditure on behalf of a candidate or political party.  RSA 664 defines "independent expenditure" to include an expenditure expressly advocating the election or defeat of a candidate, that is made <u>without</u> cooperation or consultation with a candidate.  RSA 664:2,XI.  So, for example, a corporation or individual might decide to finance, produce, and run a television advertisement supporting or opposing the election of candidates from a particular political party based upon their position on,

7

say an income tax.  As long as that advertisement is created and funded without input from a particular candidate, it constitutes an "independent expenditure."  See generally, Buckley v. Valeo, 424 U.S. 1, 46-47 (1976).


    C.    Plaintiffs' Standing.

Although defendants have not contested it, it bears noting that plaintiffs do have standing to bring a pre-enforcement challenge, on First Amendment grounds, to the constitutionality of a state statute providing criminal penalties for its violation.  See New Hampshire Right to Life Political Action Committee v. Gardner, 99 F.3d 8, 13-14 (1st Cir. 1996).  The statute at issue here presents a credible threat of present or future prosecution for its violation, and plaintiffs have been chilled from exercising their rights to political expression in order to avoid enforcement consequences.  "In such situations the vice of the statute is its pull toward self-censorship," id., "a harm that can be realized without an actual prosecution." Virginia v. American Booksellers, 484 U.S. 383, 393 (1988). Having engaged in arguably prohibited conduct, plaintiff Lander Associates faces a credible threat of prosecution under the

statute and defendants have not disavowed any intention to enforce the statute against it.  See generally, Rhode Island Ass'n of Realtors v. Whitehouse, __ F.3d __, 1999 WL 1128676 (1st Cir. Dec. 14, 1999).

And, while neither plaintiffs nor defendants mention the source of the corporate contribution by Lander Associates (from treasury or segregated funds), that issue is immaterial here since, in the First Amendment context, parties with standing may challenge a statute under the overbreadth doctrine even if, had the statute been more narrowly drafted, it could constitutionally regulate the specific conduct in which the party proposes to engage (say, a contribution from treasury funds).  See e.g., Lewis v. City of New Orleans, 415 U.S. 130, 134 (1974).

The Supreme Court has described the "overbreadth doctrine" in the following terms:

> Simply put, the doctrine asserts that an overbroad
> regulation of speech or publication may be subject to
> facial review and invalidation, even though its
> application in the instant case is constitutionally
> unobjectionable.  Thus, a person whose activity could
> validly be suppressed under a more narrowly drawn law
> is allowed to challenge an overbroad law because of its

9

application to others.  The bare possibility of unconstitutional application is not enough; the law is unconstitutionally overbroad only if it reaches substantially beyond the permissible scope of legislative regulation.  Thus, the issue under the overbreadth doctrine is whether a government restriction of speech that is arguably valid as applied to the case at hand should nevertheless be invalidated to avoid the substantial prospect of unconstitutional application elsewhere.

City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 800 n.19 (1984) (quoting Jeffries, Rethinking Prior Restraint, 92 Yale L. J. 409, 425 (1983)).  Accordingly, where the statute at issue "unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack."  Id.

In short, where a statute presents a realistic danger that it will significantly chill or compromise recognized First Amendment freedoms of parties not currently before the court, and when that statute does not readily lend itself to a narrowing construction by the state courts, a party may challenge that statute on grounds that it is overbroad even if the conduct in which that party engaged might legitimately be restricted if the

10

statute had been properly drafted, in less sweeping terms.  See
Erznoznik v. City of Jacksonville, 422 U.S. 205, 216 (1975).


Based upon the undisputed facts of this case, the court
concludes that Lander Associates has standing to challenge RSA
664:4,I.  Moreover, plaintiff may challenge not only the specific
ban on the conduct in which it engaged (that is, corporate
political contributions directly to a candidate's campaign), but
also those aspects of RSA 664:4,I which purport to restrict other
forms of arguably protected corporate political speech (e.g.,
corporate contributions to political parties and political
committees).  See generally Gooding v. Wilson, 405 U.S. at 520-
21; Thornhill v. Alabama, 310 U.S. 88, 97-98 (1940).


II.  The Statute's Constitutional Deficiencies

    A.  Determining the Scope of RSA 664:4,I.

The text of RSA 664:4 provides, in pertinent part, as
follows:

> No contribution, whether tangible or intangible, shall
> be made to a candidate, a political committee, or
> political party, or in behalf of a candidate or
> political committee or political party, directly or
> indirectly, for the purpose of promoting the success or

11

> defeat of any candidate or political party at any state
> primary or general election:
>
> I.   <u>By any corporation</u>, or by any officer,
>      director, executive, agent or employee acting
>      in behalf of such corporation, or by any
>      organization representing or affiliated with
>      one or more corporations or by any officer,
>      director, executive, agent or employee acting
>      in behalf of such organization.

RSA 664:4,I (emphasis supplied).  As mentioned earlier, elsewhere in the statute the term "contribution" is defined as any "payment, gift, subscription, assessment, contract, payment for services, dues advance, forbearance or loan to <u>a candidate or political committee</u> made for the purpose of influencing the nomination or election of any candidate."  RSA 664:2,VIII (emphasis supplied).

No doubt because defendants tacitly acknowledge that, post-<u>Austin</u>, a complete statutory ban on corporate political contributions cannot survive constitutional scrutiny, they assert that the statute is not unconstitutionally overbroad because it "does not prohibit corporate contributions that originate from a segregated account or fund."  Defendants' memorandum (document

12

no. 10) at 5.[1]  Defendants argue, specifically, that New

Hampshire's statute should be understood (and presumably that it

would be understood by any potential corporate contributor) to

ban only contributions made from "_treasury funds_" but not to ban

political contributions if the source is "segregated funds."  The

statute's seemingly absolute prohibition against corporate

political contributions does not actually preclude corporations

_____

[1]     Defendants also say Austin does not apply, because
unlike the Michigan statute at issue in _Austin_, New Hampshire's
statute does not speak directly to corporate "independent
expenditures."  Defendants' legal point is incorrect; _Austin_ is
both instructive and applicable precedent.  But, defendants'
factual point perhaps exposes another major weakness in the
statute, if the general statutory scheme is indeed intended to
restrict corporate participation in state election campaigns to
the full extent permitted by the First Amendment.  That is,
nothing in New Hampshire's campaign finance law seems to prohibit
corporations from making "independent expenditures" of an
unlimited amount _from_ _treasury_ _funds_ to elect or defeat a
candidate for state office.  "Contributions" and "independent
expenditures" are, of course, quite different forms of political
speech.  Nevertheless, nothing in the statutory scheme addresses
corporate independent expenditures (i.e., no provision either
prohibits corporations from making them or limits their source to
defined segregated funds).  While the statutory definition of
"independent expenditure" probably covers those made by a
corporation (as an "other entity"), _see_ RSA 664:2,XI, the
"Prohibited Political Expenditures" section of the statute, RSA
664:5, does not purport to ban independent expenditures by
corporations from "treasury funds" or otherwise, or to limit them
at all for that matter, with one minor exception:  all
independent expenditures for political advertising in newspapers
and on radio or television, etc., must be paid for at the
applicable rates filed with the secretary of state.  RSA 664:5.

13

from making such contributions, say defendants, so long as the funds used represent voluntary donations and are held in a segregated account (and are not derived from "amassed wealth" attributable to corporate business activity).[2]

Besides, say defendants, they have collectively determined not to enforce the statute as it is written, but rather as they construe it (pointing to instances in which corporations have been permitted to form separate political action committees). Thus, defendants suggest that all is well and no corporation faces potential prosecution for making political contributions, if they are made from a segregated account in a manner consistent with defendants' own reading of the statute. Defendants' argument recognizes, then, that states may not constitutionally prohibit all corporate political contributions.

---

[2] Actually, defendants may also imply that a corporation cannot even maintain a segregated fund and make political contributions in its own name from that fund, but, instead, must actually form a separate political committee. Under the statute, however, a political committee is a separate entity comprised of "2 or more persons [organized] to influence elections . . . ." RSA 664:2,III. So, a corporation could not form a political committee by itself. And, the speech of a political committee is not speech of the corporation that formed it. In any event, the issue here is not whether a corporation can form another entity to raise funds to contribute to a candidate, but whether a corporation may itself raise funds to contribute to a candidate.

14

But, of course, the reality is that the statute's language does not admit of any exceptions, and neither the governor, the other defendants, nor this court is in a position to effectively rewrite the legislation actually enacted by the General Court. Nor can defendants overcome the statute's overreaching character by unilaterally implementing relaxed (and necessarily transitory) enforcement policies.

Facially, the statutory language used by the legislature is both straightforward and all-encompassing: A corporation shall not, under pain of criminal sanction, make any direct or indirect contribution to a candidate, political committee, or political party. See RSA 664,I and 21,V. Nor may a corporation make any expenditure "in behalf of [probably meaning at the direction of or in coordination with] a candidate or political committee or political party" where the purpose is to promote "the success or defeat" of any candidate or political party at any state primary or general election. RSA 664:4.

Defendants' contention that the broad statutory ban is actually a limited one, and precisely targets only that corporate

15

political speech subject to permissible regulation, (i.e., that the ban only applies by its terms to corporate political contributions made from treasury funds) is untenable. First, defendants' suggested words of limitation are nowhere to be found in the statute. The statute contains no hint at all that corporate political contributions from segregated accounts are permissible. Nor does RSA 664 even mention "segregated accounts" or "segregated funds." And, the phrase "no contribution" - meaning no "payment, gift, subscription, assessment, contract, payment for services, dues, advance, forbearance or loan" - hardly requires an exhaustive search for meaning.

That defendants might agree the statute must, constitutionally, permit corporate political contributions from segregated accounts, does not, of course, make it so. The legislature could well have both meant exactly what it said, and said exactly what it meant. Lewis Carroll's egg notwithstanding, the meaning of words is not so elastic as to accommodate any and all convenient interpretations.[3] The legislature is entitled to

---

[3] "When I use a word," Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean - neither more nor less."
"The question is," said Alice, "whether you can make

16

the courtesy of a presumption that it knew what it was trying to accomplish, chose its words thoughtfully, knew the meaning of the words it chose, and intended its words to be read straight-forwardly.

Defendants' proposed construction of RSA 664:4,I not only imposes meaning that the words used do not convey, but it is also inconsistent with established principles of statutory construction. The applicable principle was described by the Supreme Court as follows:

> It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be "readily susceptible" to a narrowing construction that would make it constitutional, it will be upheld. The key to the application of this principle is that the statute must be "readily susceptible" to the limitation; we will not rewrite a state law to conform to constitutional requirements.

American Booksellers, 484 U.S. at 397 (citations omitted).

---

words mean so many different things."
     "The question is," said Humpty Dumpty, "which is to be master - that is all." Alice Through the Looking Glass, Lewis Carroll (1872).

The reasons underlying this rule of statutory interpretation are fairly well established and widely understood. First, federal courts must be always mindful of their limited role in the American system of government, which is to insure that statutes are interpreted in accordance with their terms, as the legislature intended, and applied in a fair and neutral manner. Even to save defective laws, courts must not intrude upon the function of the legislative branch which is, at its core, concerned with writing (and amending) legislation. See, e.g., United States v. Reese, 92 U.S. 214, 221 (1875) ("It would certainly be dangerous if the Legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government."); United States v. Albertini, 472 U.S. 675, 680 (1985) ("Only the most extraordinary showing of contrary intentions in the legislative history will justify a departure from [the plain language of a statute]. This proposition is not altered simply because application of a statute is challenged on constitutional grounds. Statutes should be construed to avoid

18

constitutional questions, but this interpretive canon is not a

license for the judiciary to rewrite language enacted by the

legislature. Any other conclusion, while purporting to be an

exercise in judicial restraint, would trench upon the legislative

powers.") (citations and internal quotation marks omitted).[4]

Thus, it is clear, particularly when First Amendment

freedoms are at issue, that courts must avoid adopting a

statutory interpretation that strays too far from the plain text

of the statute:

> This conclusion of unconstitutionality is of course no
> ground for going back to reinterpret the statute,
> making it say something that it does not say, but that
> is constitutional. Not every construction, but only
> "every reasonable construction must be resorted to, in
> order to save a statute from unconstitutionality."
> "Although this Court will often strain to construe
> legislation so as to save it against constitutional
> attack, it must not and will not carry this to the
> point of perverting the purpose of a statute . . . or

---

[4] Parenthetically, the court notes that defendants have not referenced any supportive legislative history relating to Chapter 664 of New Hampshire's Revised Statutes Annotated. Nor have they shown that their expansive interpretation of the statute is consistent with the actual intent of New Hampshire's legislature. Certainly what history is available provides no hint of an intent to minimize the risks of corruption of the electoral process by prohibiting only corporate contributions made from treasury funds. <u>See</u> N.H. Laws, Chapter 212 (SB 178), section 212:1 (Exhibit 1 to document no. 10).

judicially rewriting it."  Otherwise, there would be no
such thing as an unconstitutional statute.

United States v. X-Citement Video, Inc., 513 U.S. 64, 86 (1994)

(Scalia, J. dissenting) (citations omitted).  See also George

Moore Ice Cream Co. v. Rose, 289 U.S. 373, 379 (1933) (Cardozo,

J.) ("A statute must be construed, if fairly possible, so as to

avoid not only the conclusion that it is unconstitutional, but

also grave doubts upon that score.  But avoidance of a difficulty

will not be pressed to the point of disingenuous evasion. . . .

The problem must be faced and answered.") (cited in Seminole

Tribe of Florida v. Florida, 517 U.S. 44, 57 n.9 (1996)).


Finally, it is important to note that RSA 664 provides

criminal penalties for corporations, like Lander Associates, that

violate its terms.  See RSA 664:21,V.  Criminal statutes must

provide clear and unambiguous notice to the public of what

conduct is proscribed and what conduct is permitted.  If a

criminal statute fails to give fair warning of its scope to the

public, citizens may well forego entirely lawful (and even

constitutionally protected) conduct, merely to avoid the

(unwarranted) threat of criminal penalties.  Even if construed as

20

defendants wish, RSA 664:4,I fails to provide fair warning of its scope since no reasonable reader would have any idea that the statute's absolute and unequivocal ban on corporate political contributions is in fact quite equivocal and conditional.

Moreover, even if this court were inclined to adopt defendants' proposed construction of RSA 664:4,I, and "read" (or, more accurately, "write") into the law exceptions and limitations necessary to make it both consistent with <u>Austin</u> and constitutional, only those few citizens schooled in constitutional law (or so devoid of other interests in life that they habitually read obscure judicial opinions) would understand that New Hampshire's law does not (and, in fact, can not) prohibit all of the conduct it unambiguously purports to reach. Only a relatively small minority would feel at liberty to engage in constitutionally protected conduct. The vast majority (corporations and individuals), however, unaware of the constitutionally mandated "implicit exceptions" defendants would have the court read into the statute, would be chilled in the exercise of their constitutional rights – mistakenly, but understandably, fearing that any corporate political

21

contribution, even one from a segregated fund, would violate the law as written and thus, expose them to penalties including criminal sanctions.

Accordingly, the court must interpret RSA 664:4,I, as written: it bans corporations from making any and all political contributions. The next question is whether the statute, as written, is constitutional. It is not.

B. RSA 664:4,I is Unconstitutionally Overbroad.

The absolute ban on any corporate contribution markedly distinguishes RSA 664:4,I, from campaign finance laws found constitutionally inoffensive by the Supreme Court. Contrary to defendants' assertions, for example, New Hampshire's law is quite unlike the Michigan law found valid in Austin v. Michigan Chamber of Commerce, supra. Michigan's legislature drew a careful distinction, in the text of its statute, between prohibited corporate treasury expenditures, and permitted corporate segregated fund expenditures. The Michigan statute unambiguously and specifically prohibits "corporations from using corporate treasury funds for independent expenditures in support of, or in

22

opposition to, any candidate in elections for state office."
Id., at 654 (emphasis added). As the Supreme Court pointed out,
Michigan's statute (again, unlike New Hampshire's) also expressly
allowed corporations to "make such expenditures from segregated
funds used solely for political purposes." Id., at 655.
Importantly, the Court took pains to note that "[t]he [Michigan]
Act exempts from this general prohibition against corporate
political spending any expenditure made from a segregated fund."
Id., at 655-56 (emphasis added). And, the High Court pointed out
that Michigan's law was carefully modeled after the Federal
Election Campaign Act of 1971, 86 Stat. 11, as amended, 2 U.S.C.
§§ 431-455, which also explicitly and unambiguously permits
"corporations . . . to use segregated funds to finance
independent expenditures [and corporate contributions to
candidates[5]] made in federal elections" (again, unlike New
Hampshire's law that admits of no such exception based on fund

---

[5]  FECA, unlike New Hampshire's statute, specifically
permits political contributions and independent expenditures by
corporations to candidates, subject to limitations on amount, so
long as the source of those contributions is a separate account
maintained by the corporation and funded by voluntary donations
from a carefully defined class of people related to the
corporation.  See 2 U.S.C. § 441b(2)(C).

sources or segregated accounts and imposes an outright ban on any corporate contributions).

To be sure, the Supreme Court has recognized that corporate political speech, while protected by the First Amendment, is, nevertheless, subject to reasonable regulation by a state.[6] However, such regulation is constitutionally permissible only to the extent that the statute is narrowly tailored to serve a compelling state interest. See, e.g., Austin, 494 U.S. at 657; Federal Election Comm'n v. Mass. Citizens for Life, Inc., 479 U.S. 238, 256 (1986). States do have a recognized and compelling interest in minimizing the probability of corruption, and even the appearance of corruption, of the electoral process itself. So, state-imposed limitations on large contributions (from anyone – individual or corporation) to candidates for public office do

---

[6] Of course a state can constitutionally place reasonable limits on the amount of such contributions, currently as low as $1,000. See Buckley v. Valeo, 424 U.S. 1 (1976); see also, RSA 664:4,V. Defendants say, alternatively, that the legislature imposed such a limit, since the term "person" as employed in RSA 21:9 covers corporations, and existing legislation limits the amount any "person" can contribute to a candidate under various circumstances. So, even though RSA 664:4,I, is unenforceable, corporations are arguably limited in the same manner as individual citizens in the amount they may contribute. That issue is not raised in this case, so it need not be resolved.

24

not violate First Amendment guarantees because "[t]o the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined."  Buckley v. Valeo, 424 U.S. 1, 26-27 (1976).

And, because "direct corporate spending on political activity raises the prospect that resources amassed in the economic marketplace may be used to provide an unfair advantage in the political marketplace," Federal Election Commission v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 257 (1986), the Court has recognized another state interest sufficiently compelling to support legislation restricting corporate political spending.  Albeit over vigorous dissent, a majority of the Justices held in Austin that a state may also constitutionally restrict corporations from making "independent expenditures" from treasury funds to support or oppose a candidate for election to state office, because states have a compelling interest in limiting "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the

25

public's support for the corporation's political ideas."  <u>Austin</u>,
494 U.S. at 660.

Having recognized that interest as compelling, the Court
then determined that Michigan's statute survived constitutional
challenge because it was <u>narrowly</u> <u>tailored</u> to address that
interest.  The statute was narrowly tailored because,
significantly, it clearly did not purport to impose an absolute
ban on corporate independent expenditures made to elect or defeat
a candidate.  Instead, the Michigan statute drew a careful and
explicit distinction between corporate political expenditures
made from treasury funds (funds amassed in the marketplace,
employing the state-conferred advantages of doing business in
corporate form, not representing any particular support for the
corporation's political ideas, and potentially capable of
corruptly and unfairly distorting the political process) on the
one hand, and corporate political contributions from segregated
funds (funds not derived from the marketplace and the advantages
of doing business in the corporate form, voluntarily donated, and
that do represent popular support for the corporation's political
ideas), on the other.  While the state's compelling interest

warranted prohibiting expenditures from treasury funds, it did not warrant prohibiting expenditures from segregated funds. And, because the statute was narrowly focused, prohibiting only political contributions from treasury funds and not restricting those from segregated accounts, it passed constitutional muster.

Defendants, of course, do not suggest that New Hampshire has some compelling interest in prohibiting corporations from making contributions to candidates from so-called segregated funds, nor could they reasonably make that argument in light of Austin. Corporate contributions from segregated funds (particularly if limited in amount, as currently allowed by Buckley v. Valeo), do not raise any spectre of quid pro quo corruption, or the appearance of it, nor do they pose any of the risks of corrosive, distortive, or unrepresentative effects on the electoral process that contributions from corporate treasury funds pose. Corporations seeking to contribute to candidates (and political committees or political parties) from segregated funds are constitutionally indistinguishable from individual citizens seeking to contribute to candidates from their own funds. If, as Buckley teaches, a $1,000 contribution from a private citizen

27

does not implicate compelling state interests related to the fact or appearance of <u>quid</u> <u>pro</u> <u>quo</u> corruption, how can it be said that a $1,000 corporate contribution from segregated funds implicates a compelling state interest related to the fact or appearance of <u>quid</u> <u>pro</u> <u>quo</u> corruption?  And, if corporate contributions originate from funds donated by those who choose to support the corporation's political ideas and agenda, no issue of corporate diversion of "amassed business wealth" arises.

But to be fair to defendants, they do seem to recognize those points.  They base their defense of the statute, as mentioned earlier, not on the premise that the legislature can constitutionally ban any and all corporate political contributions, but rather on their own hopeful and rather strained reading of implicit limitations into the statute's

28

text.[7]  They argue that the legislature did not mean what it said

---

[7]  Defendant's reliance on <u>Pipefitters Local Union No. 562,</u> <u>et al. v. United States</u>, 407 U.S. 385 (1972) in that regard is also misplaced for several reasons, among them:  1) the Court did not hold in <u>Pipefitters</u> that Congress could impose a blanket prohibition on union (or corporate) political contributions, but, to the contrary, the majority recognized that union (and corporate) political contributions to candidates are protected under the First Amendment to the extent made from a separate fund or segregated account and the money represents voluntary contributions from members (or others); 2) the union and government <u>agreed</u> in that case that the federal statutory ban on union (and corporate) political contributions (then in effect) did not preclude so-called segregated fund contributions or expenditures (an "agreement" Justice Powell, in dissent, vigorously challenged, given the plain words used in the statute); 3) the detailed and extensive legislative history of the federal statute (then 18 U.S.C. § 610) satisfied the majority (but not the dissent) that the parties' "agreement" was supportable since it revealed Congress' intent to prohibit only political contributions by unions (or corporations) from general treasury revenues; and 4) in any event, the federal statute was amended by Congress in 1971, while the case was pending, to make it statutorily explicit and unambiguous (again unlike RSA 664:4,I) that indeed the prohibition on union (and corporate) contributions did not apply to contributions from segregated funds maintained by a union (or corporation).

With regard to RSA 664:4,I, the parties: 1) do not agree as to its applicable scope; 2) the broad language is plain and resort to legislative history would not be appropriate, nor necessary to appraise an "agreed upon" construction; 3) besides, there is apparently no legislative history suggesting limited application (or defendants surely would have referenced it); 4) the legislature has not amended the statute to explicitly limit its application; and, 5) reasonable corporations (like Lander Associates) can not be expected to discern from the broad prohibitory language used that some corporate political contributions are nevertheless permitted, and could reasonably anticipate prosecution if it made any corporate contribution.

or did not say what it meant.

In the end, the statute does not lend itself to defendants'
reading.  The words employed by the legislature are clear and
unambiguous and evidence an intent to preclude corporations from
making any political contributions, regardless of the source of
those contributions.  Thus, the statute reaches too far,
prohibiting constitutionally protected conduct without any
compelling state interest in doing so.

## Conclusion

The relevant Supreme Court opinions addressing campaign
finance laws make one thing perfectly clear: corporations have a
constitutionally protected right to make political contributions
and independent expenditures, in their own names, from what have
come to be known as segregated funds.  The plain terms of New
Hampshire's statute infringe that right without serving any
compelling state interest, or, perhaps more accurately, the
statute is not narrowly tailored to serve any compelling state
interest.

30

Defendants' reargument does little more than invite this federal court to rewrite New Hampshire's statute to meet First Amendment requirements – a rather inescapable irony given recent local events and times.  With respect, however, the court must decline defendants' collective invitation, however well-intentioned, to rewrite RSA 664:4,I.

There is, of course, a simple solution to this simple problem, but it is not found in judicial lawmaking or executive policies of casual enforcement of the State's campaign finance laws.  The solution lies with the legislature.  If, as defendants seem to believe, New Hampshire's General Court did not mean what it said or did not say what it meant, and, when it banned <u>any</u> corporate political contributions, direct or indirect, it actually intended to <u>permit</u> corporations to make some discrete political contributions to candidates, political committees, and political parties from segregated accounts, then the General Court can easily and effectively amend the statute to reflect its actual (constitutional) intent.

In the meantime, however, the court reads the statute as it is plainly written, and as plainly written it is undeniably unconstitutional. Words mean something and the words used by the legislature in RSA 664:4,I, are neither ambiguous nor imprecise. The phrase "No contribution . . . shall be made to a candidate, a political committee, or political party . . . directly or indirectly . . .[b]y any corporation," requires no deep analysis or tortured interpretation. Those words unmistakably express the legislature's far-reaching intent – that <u>all</u> corporate political contributions to candidates for state office, political committees, and political parties, from whatever source, are prohibited. Any reasonable corporate citizen would certainly read the prohibition in that way. If, as defendants suggest, FECA was indeed the model for RSA 664:4,I, the drafters left out significant and critical provisions that should be fairly easy to restore.

Having fully reconsidered the matter, defendants' motion to alter or amend judgment (document no. 15) is denied. RSA 664:4,I, is unconstitutional and unenforceable.

**SO ORDERED.**


_____
Steven J. McAuliffe
United States District Judge

December 23, 1999

cc:  Alfred J. T. Rubega, Esq.
     William C. Knowles, Esq.
     Martin P. Honigberg, Esq.
        Senior Assistant Attorney General